| | | |
|---|---|---|
| STATE OF INDIANA | ) | |
| | ) SS: | |
| COUNTY OF HUNTINGTON | ) | CAUSE NO. |

OPAL MILLMAN, on behalf of herself )  35D01 1 6 0 7 PL 0 0 0 3 9 0
and all others similarly situated, )

        Plaintiff, )

    vs. )

UNITED TECHNOLOGIES CORPORATION, )
LEAR CORPORATION EEDS AND )
INTERIORS, as successor to United Technologies )
Automotive, Inc., ANDREWS DAIRY )
STORE, INC., and L.D. WILLIAMS, INC., )

        Defendants. )

**FILED**

JUL 18 2016

*Kittie Keiffer*
Clerk Huntington Superior Court

## CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND REQUEST FOR JURY TRIAL

Plaintiff, Opal Millman, alleges and states:

### I.   NATURE OF THE ACTION

Plaintiff brings this action, on behalf of herself and all others similarly situated in the

Town of Andrews (the "Town"), to recover personal injury and property damages they have

suffered as a result of their exposure to trichloroethylene ("TCE"), vinyl chloride, benzene, and

other aromatic chemicals.  United Technologies Automotive ("UTA") owned and operated a

manufacturing facility located at 303 North Jackson Street, Andrews, Indiana (the "UTA

Facility") in which hazardous chemicals, including TCE, were used and improperly disposed of

and dumped.  UTA was owned by and operated as a subsidiary to United Technologies

Corporation ("UTC") until UTA was sold to Lear Corporation in 1999.  At that time, UTA's

name was changed to Lear Corporation Eeds and Interiors ("Lear").

Andrews Dairy Store is a Citgo-branded retail gasoline service center and convenience store located at 155 North Main Street, Andrews, Indiana (the "Gas Station"). The Gas Station is downgradient (southwest) of the UTA Facility. The Gas Station was formerly owned and operated by Defendant Andrews Dairy Store, Inc. and is currently owned and operated by Defendant L.D. Williams, Inc. During the course of its operations, the Gas Station released petroleum from its underground storage tanks and, as a result, caused petroleum vapors to infiltrate the Town's municipal sanitary sewer system and numerous homes within the Town.

As a direct and proximate result of Defendants' wrongful actions and inactions, hazardous chemicals released at the UTA Facility and the Gas Station have entered the Plaintiff's neighborhood and impacted her home and body. The hazardous chemicals released at the UTA Facility and the Gas Station have entered the environment and migrated through the subsurface soil and groundwater into the Plaintiff's neighborhood (the "Neighborhood") and continue to migrate into the Neighborhood causing further damage. In fact, vinyl chloride, a known human carcinogen and degradation product of TCE, has been detected since 1993 in the Town's public well field. The Plaintiff was and continues to be exposed to TCE, benzene, and other hazardous chemicals by virtue of harmful vapors that have entered and continue to enter her home from the contaminated soil and groundwater and through Andrews' sewer lines. For instance, as recently as March 2016, indoor air sampling of Plaintiff's home detected harmful concentrations of TCE and benzene in her basement and first floor living space.

As a result of Plaintiff's exposure to Defendants' hazardous chemicals, Plaintiff and other putative class members who live in the Neighborhood have suffered property damages and bodily injuries, and are now at an increased risk of developing cancer and other serious latent diseases in the future. Plaintiff's late husband, Jack Millman, suffered from excruciating pain

diagnosed as Trigeminal Neuralgia, prior to his death on December 29, 2014. TCE exposure can cause Trigeminal Neuralgia. Plaintiff, just like her late husband, now suffers from diagnosed Trigeminal Neuralgia, causing excruciating pain and facial nerve dysfunction – making it painful to do the most basic things like talking and eating. Plaintiff and putative class members also suffer from emotional distress arising out of those physical impacts. Through this class action suit, Plaintiff seeks to hold Defendants liable for their respective acts and omissions in causing and allowing the contamination to migrate and persist in the Neighborhood.

## II.    PARTIES

1.     Plaintiff Opal Millman is a citizen of Huntington County, Indiana, and resides within the Neighborhood at 156 North Main Street, Andrews, Indiana 46702.

2.     Defendant United Technologies Corporation is a Delaware corporation with its corporate office located at 10 Farm Springs Road, Farmington, Connecticut 06032.

3.     Defendant Lear Corporation Eeds and Interiors, Inc. is a Delaware corporation with its corporate office located at 21557 Telegraph Road, Southfield, Michigan 48033, and is the successor to United Technologies Automotive, Inc.

4.     Defendant Andrews Dairy Store, Inc. is an Indiana corporation with its principal office located at 138 Snowden Street, Andrews, Indiana 46702.

5.     Defendant L.D. Williams, Inc. is an Indiana corporation with its principal office located at 155 North Main Street, Andrews, Indiana 46702.

## III.    JURISDICTION

6.     Each Defendant has engaged in business in the State of Indiana; has caused personal injury and property damage by acts or omissions in the State of Indiana; and/or, owns, uses, or possesses real property or has interests in real property in the State of Indiana.

3

Therefore, this Court has jurisdiction over Defendants pursuant to Indiana Trial Rules 4.4(A)(1), 4.4(A)(2), and 4.4(A)(5).

7.      Through this lawsuit, Plaintiff, on behalf of herself and other similarly situated, seek damages and injunctive relief in excess of $5,000,000.

### IV.    VENUE

8.      The acts or omissions that are the subject of this Complaint occurred in the Town of Andrews, Huntington County, Indiana.  Moreover, Plaintiff resides in and owns real property in Huntington County, Indiana.  Therefore, venue in this county is proper under Indiana Trial Rules 75(A)(2) and 75(A)(5).

### V.    GENERAL ALLEGATIONS

9.      Plaintiff owns and resides in a home located within the Neighborhood.  Her home and many other properties within the Neighborhood are connected to municipal sewer and utility lines, and have basements or crawl spaces composed of concrete, bare soil, or both.

10.     UTA, a former UTC subsidiary, operated the UTA Facility from approximately 1974 through 1992.

11.     Upon information and belief, UTC sold its UTA subsidiary and the UTA Facility to Lear Corporation in 1999.  Lear Corporation then changed UTA's name to Lear Corporation Eeds and Interiors ("Lear").  Upon information and belief, UTC retained certain environmental liabilities arising from UTA's operations at the UTA Facility.

12.     Groundwater underlying the UTA Facility flows to the southwest, and directly toward the Neighborhood.

13.     UTA used large quantities of TCE – a powerful degreaser and "chlorinated solvent" – at the UTA Facility.

4

14.     As discussed in more detail below, UTA released, dumped, and/or spilled TCE and other hazardous chemicals at the UTA Facility, resulting in a plume of soil and groundwater contamination that now extends over 3,000 feet off-site (the "Chlorinated Plume") into the Neighborhood, adversely impacting Plaintiff's property and body.

15.     Defendants have failed to effectively remediate the Chlorinated Plume and, as a result, the Chlorinated Plume continues to impact Plaintiff's property and body.

16.     Specifically, when TCE-contaminated groundwater underlies a home, the TCE may rise through the soil, through a process known as volatilization, to create harmful and sometimes deadly vapors.  Additionally, the contaminated groundwater has infiltrated the Town's sanitary sewer system and other utility lines.

17.     Prolonged inhalation of TCE vapors (and vapors from TCE degradation products, including vinyl chloride) may cause a number of health conditions, including Trigeminal Neuralgia.

18.     The Gas Station is a gasoline retailer and convenience store that was formerly owned by Andrews Dairy Store, Inc., and is currently owned by L.D. Williams, Inc.

19.     The Gas Station is located downgradient of the UTA Facility and sits on top of the Chlorinated Plume.

20.     The Gas Station regularly stores thousands of gallons of gasoline, a complex substance consisting of benzene and other toxic "aromatic" hydrocarbon chemicals.

21.     As discussed in more detail below, the Gas Station released, dumped, and/or spilled petroleum products, including gasoline, resulting in a plume of soil and groundwater contamination that includes benzene, toluene, ethyl benzene, and xylene and extends off-site into the same Neighborhood as the Chlorinated Plume (the "Aromatic Plume").

5

22.     Similar to TCE, when petroleum-contaminated groundwater underlies a home, the aromatic petroleum constituents may rise through the soil to create harmful and sometimes deadly vapors.

23.     Those vapors are also present in the Town's sanitary sewer system.

24.     Petroleum contains benzene, a known human carcinogen, and other harmful aromatic chemicals; prolonged inhalation of petroleum vapors may cause cancer and a number of pathological conditions.

### UTA's Operations at the UTA Facility and Discovery of the Chlorinated Plume

25.     UTA commenced operations at the UTA Facility in 1974, manufacturing steel and brass fittings.

26.     Throughout its 20-year operating history, UTA purchased, stored, used, and disposed of TCE and other hazardous chemicals.

27.     UTA operated a 3,000 gallon above-ground storage tank and a 2,500 gallon above-ground storage tank at the UTA Facility, both of which stored virgin TCE.

28.     UTA's operations also included two TCE degreaser pits that were located inside the UTA Facility along the south interior wall. The degreaser pits were approximately 18.5 feet long, 15 feet wide, and two feet deep, with a concrete sump that was approximately two feet deep.

29.     TCE from the degreaser pits was reclaimed in solvent stills located adjacent to the pits.

30.     TCE frequently overflowed the degreaser pits, causing the TCE to enter the soils and groundwater beneath the UTA Facility.

31.     UTA purchased approximately 44.5 tons of TCE per year.

6

32.     UTA used TCE as a degreasing solvent and generated a large amount of TCE waste.

33.     UTA operated the UTA Facility until 1992.

34.     In connection with UTA's discontinuation of its operations in 1992, environmental site assessments were performed at the UTA Facility.

35.     The initial site investigations were performed in September and October 1992 and revealed to UTA the existence of the Chlorinated Plume.

36.     TCE was detected in the groundwater underlying the UTA Facility in concentrations as high as 1,000,000 parts per billion ("ppb") in June 1994.

37.     The Maximum Contaminant Level ("MCL") established by the United States Environmental Protection Agency ("USEPA") for TCE is 5 ppb, and the Maximum Contaminant Goal ("MCG") is 0 ppb.

38.     The Chlorinated Plume extends approximately 3,000 feet southwest of the UTA Facility.

39.     The Town uses three water supply wells, which are located approximately 2,700 feet downgradient of the UTA Facility.

40.     The Chlorinated Plume extends to the Town well field and has infiltrated the well field, and as a result, a water treatment system, which consists of a packed tower air stripper, was installed by UTA at the Town well field in 1994.

41.     Groundwater is drawn from each of the Town's three wells on a rotating basis and is combined into a large holding tank prior to being treated by the air stripper. After passing through the air stripper, the water is available to the Town's utility for final treatment before distribution to residential customers.

42.     On July 7, 1994, UTA filed an application with the Indiana Department of
Environmental Management ("IDEM") to be admitted into the Indiana Voluntary Remediation
Program ("VRP"). *See* Ind. Code § 13-25-5-1 *et seq.*

43.     The VRP, which is entirely voluntary, can be used to avoid regulatory
enforcement of environmental cleanup laws.  However, VRP participants, like UTC in this case,
often take advantage of the VRP and fail to timely and properly remediate contamination for
decades, allowing harmful contamination to persist in drinking water sources and as vapors
within residential neighborhoods.

44.     In its VRP Application, UTA admitted it had caused the Chlorinated Plume,
stating that "[t]he current and former TCE ASTs on the former UTA plant property appear to be
the main source areas for solvent contamination of the soil and groundwater on the plant
property."

45.     On August 2, 1994, IDEM sent a letter to UTA stating that UTA had been
admitted into the VRP and had been assigned Site Identification No. 6930702.

46.     On October 20, 1994, UTA and IDEM signed a Voluntary Remediation
Agreement ("VRA").

47.     In January 1994, dense non-aqueous phase liquid ("DNAPL") was observed in the
groundwater at the UTA Facility.  Laboratory analysis confirmed that the DNAPL contained
TCE.

48.     The presence of DNAPL was significant; DNAPL is generally the most heavily
concentrated form of contamination and poses the greatest challenges in remediation.

49.     Soil sampling conducted in May and September 2001at the UTA Facility detected
TCE concentrations as high as 340,000 ppb in the former TCE degreaser area.

8

50.     UTC has undertaken several inadequate measures to control and remove contamination, and as a result, harmful contamination continues to migrate into the Neighborhood.

51.     Monitoring wells throughout the Neighborhood continue to show high levels of TCE in the groundwater.

52.     For instance, groundwater sampling conducted in March 2016 showed concentrations of TCE as high as 1,170 ppb in an off-site monitoring well.

53.     The TCE and vinyl chloride contamination from the underlying Chlorinated Plume continues to pose a risk to the homes and businesses within the Neighborhood.

54.     Despite the passage of 22 years as a "voluntary participant" in IDEM's VRP, UTC has never completed its Remediation Work Plan, sources at the UTA Facility have not been remediated, and the Neighborhood remains contaminated to unacceptable levels.

### The Gas Station's Operations and Discovery of the Aromatic Plume

55.     The Gas Station is a retail gasoline center and convenience store that has been in operation since the 1960s.

56.     The Gas Station operated four underground storage tanks ("USTs") – one 10,000 gallon gasoline tank, one 8,000 gallon gasoline tank, one 4,000 gallon diesel tank, and one 1,000 gallon kerosene tank.

57.     All four USTs were installed in 1979.

58.     The 1,000 gallon kerosene UST was removed on June 9, 1998.  Upon information and belief, the other three USTs are still used today.

9

59.     In April 1993, Huntington County notified IDEM as to the presence of petroleum vapors in the Town's municipal sanitary sewer system and specifically in a sewer line beneath North Main Street.  There was also petroleum sheen on water within the sewer line.

60.     A subsequent investigation indicated that petroleum vapors were present in residences sourced from the sewer line and that the impact to the sewer line was attributable to a fuel release from the UST(s) at the Gas Station.

61.     Because the petroleum contamination resulted from a release from a UST, the Gas Station was placed by IDEM in its Leaking Underground Storage Tank ("LUST") program.

62.     IDEM assigned the Gas Station LUST Identification No. 1993-04-288.

63.     In July 1993, the Gas Station installed a groundwater/fuel recovery system in a trench adjacent to the utility corridor along Main Street, which removed over 900 gallons of gasoline by the fall of 1993.

64.     However, significant and dangerous quantities of gasoline were left unremediated.

65.     In September 1993, the Gas Station retained EnviroScience Inc. to conduct an environmental site investigation to determine the extent of subsurface petroleum impacts at the site.

66.     After its investigation, EnviroScience submitted a corrective action plan to IDEM on April 24, 1995 (the "1995 CAP"), which recommended use of a pump-and-treat system and an in-situ bio-augmentation system.

67.     The 1995 CAP was never approved and, therefore, this system was never installed.

10

68.     In October 1999, SES Environmental prepared a different corrective action plan on behalf of the Gas Station (the "1999 CAP"), which recommended monitored natural attenuation as the chosen remediation approach.

69.     "Monitored Natural Attenuation" means, in layman's terms, that no actual cleanup effort will be made; instead, the contamination is allowed to persist in the subsurface and "nature" (i.e., soil bacteria) will – over decades in many cases – "eat" the contamination.

70.     IDEM approved the 1999 CAP on December 17, 1999.

71.     On October 6, 2004, SES sent a letter to IDEM indicating that monitored natural attenuation was not working as expected and that closure could no longer be attained under that approach.

72.     Additional monitoring wells were installed on the Gas Station's property and off-site to further delineate the extent of the Aromatic Plume.

73.     On July 25, 2005, SES sent a letter to IDEM, on behalf of the Gas Station, responding to IDEM's request for information concerning potential receptors and exposure pathways related to the release of petroleum at the Gas Station.

74.     In that letter, SES indicated the following findings:

- o   There is a potential for inhalation exposure via vapor intrusion into the site building, and residential basement/crawl spaces.

- o   The sanitary sewer and county drain tile (north portion of site) are potential contaminant migration pathways.  Migration along the county drain tile would result in environmental exposure at the outfall to Loon Creek.

75.     Even though SES concluded in 2005 that "[t]here is a potential for inhalation exposure via vapor intrusion into . . . residential basement/crawl spaces[,]" the Gas Station has

11

not conducted any of its own indoor air testing to determine the existence of vapor intrusion in homes in the Neighborhood.

76.     Despite the Gas Station's investigation and remediation work, IDEM stated in a letter dated March 8, 2012, that "[p]lume expansion appears to be occurring. . . ."

77.     SES conducted quarterly sampling in November 2015, which detected high concentrations of benzene in both on-site and off-site monitoring wells.

78.     For instance, in MW-3, which is located on-site close to the UST area, benzene was detected at 17,100 ppb in the shallow groundwater. In MW-11 and MW-28, which are both off-site in the Neighborhood, benzene was detected in the shallow groundwater at 149 ppb and 133 ppb, respectively.

79.     The MCL established by the USEPA for benzene is 5 ppb.

80.     Petroleum contamination is continuing to migrate from the Gas Station onto Plaintiff's property, and onto other properties within the Neighborhood.

81.     The contamination from the underlying Aromatic Plume continues to pose a risk to Plaintiff and her property, and to the homes and businesses within the Neighborhood.

82.     The vapors from petroleum compounds, including benzene, emanating from the Gas Station present a current and significant danger to the Plaintiff and to residents within the Town.

**Vapor Intrusion**

83.     The Contamination[1] plume is a current source of toxic vapors throughout the Neighborhood.

84.     As illustrated in the IDEM diagram attached hereto as Exhibit 1, soil and groundwater contamination can cause vapors to enter homes and other aboveground structures.

---

[1] The Chlorinated Plume and the Aromatic Plume are referred to collectively as the "Contamination."

85.     In addition, groundwater impacted by both the Chlorinated Plume and the Aromatic Plume has infiltrated the Town's sewer lines.

86.     The Town's sewer lines provide a preferential pathway for the Contamination vapors, thereby enabling vapors to impact any home connected to an infiltrated sewer line.

87.     In fact, dangerous vapors from the Defendants' Contamination continue to be present in the indoor air of Plaintiff's home and other homes in the Neighborhood.

88.     For instance, in February 2016, Stantec (another of UTC's environmental consultants) sampled the indoor air in Plaintiff's home and, upon receiving the results in March 2016, indicated that TCE concentrations in her basement and first floor – 4.5 and 3.0 ug/m3, respectively – were higher than IDEM's published screening level of 2.1 ug/m3.  The sampling results also detected benzene in the air within the Plaintiff's home.

89.     Defendants have not taken measures to adequately inform residents of the health risks associated with exposure to TCE, benzene, and other human carcinogens, or the potential duration of their exposure.

90.     Neither Plaintiff nor, on information and belief, other residents within the Neighborhood have been informed by Defendants of the past or present risk of vapors from the Contamination.

91.     Additionally, many homes in the Neighborhood have never been tested for vapor intrusion, yet likely have been and continue to be impacted by vapors from the Contamination.

92.     Furthermore, on information and belief, the vast majority of the former and current residents of the Neighborhood were never informed at any point in time about the existence of Contamination vapors in the Neighborhood, or the adverse health risks associated with exposure to TCE, vinyl chloride, benzene, and other human carcinogens.

13

93.     Plaintiff just recently learned that dangerous levels of Contamination vapors are currently present in the indoor air of her home, and that she suffers from Trigeminal Neuralgia (just like her late husband), which can be caused by TCE exposure.

### Health Risks Associated with TCE and Benzene Exposure

94.     Both TCE and benzene have been characterized by the USEPA as "carcinogenic to humans" by all routes of exposure.

95.     On June 12, 2007, Dr. Thomas Sinks, Deputy Director of the Agency for Toxic Substances & Disease Registry and of the National Center for Environmental Health at the Centers for Disease Control and Prevention testified before a Congressional subcommittee concerning the toxic health effects of TCE.

96.     During his testimony, Dr. Sinks stated "[o]ccupational exposure to TCE may cause nervous system effects, kidney, liver and lung damage, abnormal heartbeat, coma, and possibly death" and "also has been associated with adult cancers such as kidney cancer, liver and biliary cancer and non-Hodgkin's lymphoma."

97.     The USEPA has stated that exposure to benzene vapors can cause neurologic, immunologic, and hematologic effects, and can also cause both structural and numerical chromosomal aberrations.

98.     Benzene is a known human carcinogen.  Studies have shown that benzene exposure can cause cancers in humans, including: leukemias, such as acute myelogenous, acute lymphocytic, acute erythroleukemic, acute undifferentiated, chronic lymphocytic, hairy cell, acute promyelocytic, chronic myelogenous; lymphomas, such as Hodgkin's lymphoma, non-Hodgkin's lymphoma, lymphosarcoma; and other cancers, such as multiple myeloma, reticulum cell sarcoma.

99.     Putative class members within the Neighborhood were, and continue to be, exposed to TCE, benzene, and other human carcinogens that damaged and continues to damage them physically (including placing them at an increased risk of developing cancer or other illness and disease), mentally, and emotionally.

100.     The Plaintiff and her family members have been exposed to and have inhaled Contamination vapors for an unknown period of time, and as a result, have suffered health problems.

101.     As stated above, Plaintiff's husband passed away in December 2014. Prior to his death, he was diagnosed with Trigeminal Neuralgia, which is a disorder of the trigeminal nerve at the side of the head.

102.     According to the National Institute of Neurological Disorders and Stroke, the typical form of the disorder "causes extreme, sporadic, sudden burning or shock-like facial pain that lasts anywhere from a few seconds to as long as two minutes per episode."

103.     Trigeminal Neuralgia is rare and has been linked to TCE exposure.

104.     Plaintiff was first diagnosed with Trigeminal Neuralgia in 2015.

105.     TCE and benzene present an especially serious health risk to children. Over the years, numerous minor children have resided in the Neighborhood.

106.     The Contamination vapors that invaded the Plaintiff's home, as well as the contaminated groundwater, have interfered with Plaintiff's comfortable enjoyment of her home, have rendered her home and property unmarketable, and have otherwise caused Plaintiff to suffer physical, emotional, and property damage.

107.     The presence of Defendants' TCE, vinyl chloride, benzene, and other aromatic chemicals on the Plaintiff's property and within her home constitutes an immediate human health

15

risk, and has caused and, if continued, will cause additional irreparable harm for which money damages will be inadequate.

108.    Additionally, Plaintiff has suffered irreversible injury to her DNA and is now at an increased risk of developing cancer and other serious disease in the future as a result of her exposure to TCE, benzene, and other human carcinogens.

## VI.    CLASS ALLEGATIONS

109.    Plaintiff brings this action under Rule 23 of the Indiana Rules of Trial Procedure on behalf of herself and all others similarly situated.

110.    The Class consists of all Indiana citizens within the Class Area (defined below) who have owned, rented, or resided at property at any time since 1993 that has been impacted by the Contamination caused by, or were otherwise exposed to, vapors from either the Chlorinated Plume or the Aromatic Plume (the "Class"). The Class excludes Defendants, Defendants' officers and directors, Defendants' parents, subsidiaries, and affiliates, and their respective officers and directors.

111.    The "Class Area" refers to the area impacted by the Contamination, including vapors emanating therefrom, flowing southwest from the UTA Facility and the Gas Station under the Neighborhood.

112.    The geographic area that UTC has acknowledged is within the impact zone of the Contamination is depicted by the maps attached as Exhibit 2 to this Complaint – diagrams created by UTC's own environmental consultant. Plaintiff, however, believes that the Class Area extends beyond those depicted boundaries.

113.    The Class will easily exceed one hundred (100) persons; therefore the Class is so numerous that joinder of all Class members is impracticable.

16

114.     There are core questions of law and fact that are common to each member of the Class, such as:  whether there have been releases of hazardous substances, including TCE and benzene, at and from the UTA Facility and the Gas Station; whether such releases have migrated into and contaminated and/or threatened properties within the Class Area; whether Defendants are legally responsible for the Contamination in the Class Area; whether Plaintiff and the Class have been damaged; and whether Defendants should be ordered to abate the Contamination present in the Class Area.

115.     The interests of Plaintiff are common to all Class members, and Plaintiff's claims are typical of the claims of the Class.  All claims seek recovery on the same legal theories and are based upon Defendants' common course of conduct.

116.     Plaintiff will fairly and adequately represent and protect the interests of the Class.

117.     Plaintiff has retained competent counsel experienced in class action litigation, including environmental class action suits such as this one.

118.     Plaintiff plans to seek an order of this Court bifurcating this action into two phases:  a liability phase and a damages phase.  *See LHO Indpls. One Lessee, LLC v. Bowman*, 40 N.E.3d 1264, 1277-78 (Ind. Ct. App. 2015).

119.     Pursuant to Indiana Trial Rule 23(c)(4), Plaintiff will seek class certification for the liability issues only.  *See 7-Eleven, Inc. v. Bowens*, 857 N.E.2d 382, 388-89 (Ind. Ct. App. 2006).  After determinations of liability are made with respect to the Class, Plaintiff and Class members will request separate hearings on their individual damages.  *Id.*

### Count I – Trespass

120.     Plaintiff hereby incorporates paragraphs 1 through 119 of this Complaint as though fully restated herein.

121.    Defendants unlawfully interfered with Plaintiff's property and rights by allowing or causing the Contamination and associated vapors emanating from the releases at the UTA Facility and the Gas Station to enter the Plaintiff's home and by allowing or causing Contamination to migrate onto Plaintiff's property.

122.    TCE and aromatic vapors continue to enter Plaintiff's property and home.

123.    The entry of Contamination into the Plaintiff's home and onto her property was and continues to be an unauthorized invasion and intrusion by Defendants onto the Plaintiff's property.

124.    Plaintiff has suffered damages as a result of Defendants' unlawful interference with her property and/or unauthorized invasion or intrusion of Contamination onto her property and into her home.

125.    By causing or allowing the entry of Contamination into the Plaintiff's home and by allowing or causing the migration of TCE, petroleum, and other human carcinogens onto the Plaintiff's property, Defendants have committed a trespass and are liable to the Plaintiff for all damages caused by the trespass.

### Count II – Nuisance

126.    Plaintiff hereby incorporates paragraphs 1 through 125 of this Complaint as though fully restated herein.

127.    The Contamination that migrated, and continues to migrate, onto Plaintiff's property and the associated vapors that entered, and continue to enter, Plaintiff's home as a result of the releases at the UTA Facility and/or the Gas Station were injurious to Plaintiff's health, offensive to her senses, and an obstruction to Plaintiff's use and enjoyment of her property.  As

such, the Contamination and associated vapors unduly interfered with Plaintiff's use and comfortable enjoyment of her home and property.

128.    The Plaintiff has suffered damages as a result of the Defendants' undue interference with her use and comfortable enjoyment of her home and property.

129.    Pursuant to Indiana Code § 32-30-6-6, 7 and 8, (a) the Defendants have created a nuisance by allowing or causing TCE, benzene, and other hazardous chemicals to enter Plaintiff's property and Contamination vapors to enter Plaintiff's home; (b) Plaintiff is entitled to relief abating and enjoining the nuisance; and (c) Defendants are liable to Plaintiff for all damages arising out of the nuisance.

## Count III – Negligence

130.    Plaintiff hereby incorporates paragraphs 1 through 129 of this Complaint as though fully restated herein.

131.    The Defendants owed a duty to Plaintiff, who resides in the Neighborhood, to dispose of TCE, petroleum, and other aromatic chemicals in a manner that prevented the release of those chemicals into the environment, the spill or migration of TCE, petroleum, and other aromatic chemicals onto Plaintiff's property, and the migration of Contamination into Plaintiff's home.

132.    When the Defendants allowed the releases of TCE, petroleum, and other aromatic chemicals at the UTA Facility and/or the Gas Station to occur and/or allowed or caused the migration of the Contamination onto Plaintiff's property and the entry of Contamination vapors into the Plaintiff's home, the Defendants breached their duty to the Plaintiff.

133.    The Defendants also owed a duty to Plaintiff to diligently remediate all known Contamination in a timely and effective manner in order to protect human health and the

19

environment, and to prevent the migration of the Contamination onto the Plaintiff's property and the entry of Contamination vapors into the Plaintiff's home.

134.    When the Defendants repeatedly failed to identify or delineate the extent of off-site Contamination and/or failed to remediate off-site Contamination, the Defendants breached their duty to Plaintiff.

135.    As a result of the Defendants' breaches of their duties of reasonable care, Plaintiff has suffered damages.

136.    The Defendants' breaches of their duties of reasonable care owed to Plaintiff have proximately caused Plaintiff to suffer damages.

137.    The Defendants committed negligence through their acts or omissions relating to the releases at the UTA Facility and/or the Gas Station, and they are liable to Plaintiff for any and all damages arising out of this negligence.

### Count IV – Environmental Legal Action

138.    Plaintiff hereby incorporates paragraphs 1 through 137 of this Complaint as though fully restated herein.

139.    Defendants caused the Contamination of the Neighborhood by releasing TCE, petroleum, and other aromatic chemicals into the environment during their operations, and also contributed to the Contamination by failing to prevent the off-site migration of TCE, petroleum, and other aromatic chemicals and by failing to timely remediate the off-site TCE, petroleum, and other aromatic chemicals.

140.    The Contamination poses a risk to human health and the environment.

141.     Under Indiana Code §§ 13-30-9-2 and 13-30-9-3, Plaintiff is entitled to recover reasonable costs of removal or remedial action from Defendants, together with attorneys' fees and expenses.

### Count V – Negligent Infliction of Emotional Distress

142.     Plaintiff hereby incorporates paragraphs 1 through 141 of this Complaint as though fully restated herein.

143.     When the Plaintiff was exposed to the TCE, benzene, other aromatic chemicals, and associated vapors that have invaded her home, she sustained a direct bodily impact as a result of Defendants' negligence.

144.     By virtue of Plaintiff's direct involvement in that impact, she sustained serious emotional trauma of a type normally expected to occur in a reasonable person.

145.     The Defendants' acts and omissions with respect to the releases that impacted Plaintiff and caused her to suffer emotional distress constitute negligent infliction of emotional distress.  Consequently, the Defendants are liable to Plaintiff for the resulting damages.

### Count VI – Punitive Damages

146.     Plaintiffs hereby incorporate paragraphs 1 through 145 of this Complaint as though fully stated herein.

147.     UTC knew that UTA's releases of TCE had migrated into the Neighborhood beginning at least in 1992.

148.     The Gas Station knew that its releases of benzene and other aromatic chemicals had migrated into the Neighborhood beginning at least in 1993.

149.     Defendants knew or had reason to know that the Contamination posed a risk to human health and the environment, especially to the residents of the Neighborhood.

21

150.    However, Defendants allowed the Contamination to persist in the Neighborhood for over twenty (20) years and failed to adequately notify or warn current and former residents of Contamination vapors.

151.    Defendants exhibited reckless disregard for Plaintiff's well-being, health, and property, as well as the well-being, health, and property of the general public, by failing to take sufficient or effective action to remove the Contamination from the Neighborhood or to adequately notify or warn current and former residents of the Contamination vapors.

152.    Based on Defendants' reckless disregard of Plaintiff's and the public's health, well-being, and property, an award of punitive damages is appropriate to deter Defendants and others from engaging in such a grossly negligent or reckless behavior in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and in favor of Plaintiff and the Class, and that the Court:

1.    Certify this action as a class action on liability (not damages) on behalf of Plaintiff and all others similarly situated, appoint Plaintiff's counsel as counsel for the Class, and order that Notice of this action be given to the Class;

2.    Order Defendants to pay Plaintiff and the Class an amount that will fully and fairly compensate them for their past and prospective damages;

3.    Order Defendants to pay Plaintiff and the Class their reasonable attorneys' fees and costs, including expert witness fees, of this litigation;

4.    Order the Defendants, jointly and severally, to remove the Contamination, including all related vapors, that emanated from the UTA Facility and/or the Gas Station and now exists on the Plaintiff's and the Class members' properties to non-detect levels;

5.    Award punitive damages against Defendants;

6.    Award Plaintiff all other appropriate injunctive relief; and

7.    Award Plaintiff all further relief that is just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable.

Respectfully submitted,

Thomas A. Barnard, Atty. No. 4011-49
Rodney L. Michael, Jr., Atty. No. 23681-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
Telephone: 317-713-3500
Fax: 317-713-3699

*Attorneys for Plaintiff*

16422183.3

23

# Exhibit 1

# Indiana Department of Environmental Management

## Draft Vapor Intrusion

## Pilot Program Guidance



# Exhibit 2



**Legend**

**TCE Concentration**

- Extraction Well
- Monitoring Well
- Monitoring Well (Not Contoured)
- Aquifer Pinchout

| 5 ppb | 1000 ppb |
| 10 ppb | 10000 ppb |
| 100 ppb | |

Note:
WH wells may also be known as PW

Stantec

DISSOLVED TCE
ISO-CONCENTRATION MAP
DECEMBER 2014

FOR
FORMER
UNITED TECHNOLOGIES AUTOMOTIVE
301 NORTH JACKSON ST.
ANDREWS, INDIANA

USDC IN/ND case 1:16-cv-00312-PPS-SLC   document 1-2   filed 08/26/16   page 29 of 30



USDC IN/ND case 1:16-cv-00312-PPS-SLC   document 1-2   filed 08/26/16   page 30 of 30

