UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| OPAL MILLMAN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Cause No. 1:16-CV-312-HAB |
| ) | |
| RTX CORPORATION, et al., ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

In February, the Court ordered the parties to brief Article III standing for each of Plaintiffs' claims. (ECF No. 457). That briefing is now complete. (ECF Nos. 463, 466-69). Defendants RTX Corp., Lear Corp. EEDS and Interiors, and CP Products, LLC ("RTX") concede that Plaintiff Opal Millman has standing to pursue her claims for state-law trespass and nuisance, but standing for all remaining claims is contested. (ECF No. 460). The Court will examine each claim in turn, discussing important facts when necessary.

**I.      Legal Standard for Article III Standing**

Standing doctrine traces its origins to Article III of the Constitution, which grants federal courts the power to resolve "Cases" and "Controversies." U.S. CONST. art. III, § 2. The doctrine's elements are well established and familiar. To sue in federal court, a plaintiff must have suffered (1) a concrete, particularized, and actual or imminent injury (an "injury in fact") (2) that is fairly traceable to the defendant and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

Each element of standing "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. In other words, because Defendants challenge standing at the summary judgment stage, Plaintiffs cannot rest on mere allegations of injury resulting from Defendant's conduct, but must demonstrate "a factual showing of perceptible harm." *Id*. at 561–62, 566.

## II.    Claims Against RTX

### A.    *Resource Conservation and Recovery Act ("RCRA")*

Plaintiffs bring claims under the citizen suit provision of the RCRA, 42 U.S.C. § 6972(a)(1)(B). That statute allows "any person" to bring a civil action:

> against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

*Id*. Plaintiffs seek declaratory relief and attorney fees. (ECF No. 156 at 30-31).

RTX challenges Plaintiffs' standing on two bases. First, it argues that Plaintiffs cannot establish an injury in fact because there is no imminent and substantial endangerment to health or the environment. Second, it argues that there is no redressability because of the involvement of state authorities. The Court finds that both arguments fail.

### 1.    *Injury in Fact*

Like many cases after *TransUnion*, this case presents questions of whether Plaintiffs can establish an injury in fact. An injury in fact must be both concrete and imminent. *Dinerstein v. Google, LLC*, 73 F.4th 502, 511 (7th Cir. 2023).

"A concrete injury must be *de facto*; that is, it must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotation marks omitted). Endorsing the term's "usual meaning," the Supreme Court has described a concrete injury as one that is "real[] and not abstract." *Id*. (quotation marks omitted). Both tangible and intangible harms may fit the bill, even if tangible harms like "physical or monetary injur[ies]" are more intuitively concrete. *TransUnion*, 594 U.S. at 425.

Imminence is more of an "elastic concept." *Lujan*, 504 U.S. at 564 n.2. While it lacks a precise framework, the function of the imminence requirement "is to ensure that the alleged injury is not too speculative for Article III purposes." *Id*. Accordingly, a plaintiff who has not suffered a past harm cannot simply rest on allegations that he may suffer some "possible future injury," *Whitmore v. Arkansas,* 495 U.S. 149, 155 (1990), "at some indefinite future time," *Lujan*, 504 U.S. at 564 n.2. His threatened injury instead must be "certainly impending" to satisfy Article III. *Id*. And importantly, while an imminent risk of future harm may suffice to support standing to sue for prospective relief (i.e., an injunction), a claim for damages requires a concrete harm that has in fact occurred. *TransUnion*, 594 U.S. at 436.

RTX's injury in fact argument relies on the statute's "imminent and substantial endangerment" requirement. Relying on *Meghrig v. KFC W., Inc.*, 516 U.S. 479 (1996), RTX argues that the RCRA "is not principally designed to effectuate the cleanup of toxic waste sites." (ECF No. 467 at 11). True enough. "RCRA's primary purpose, rather, is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Meghrig*, 516 U.S. at 483. For that reason, the RCRA does not allow for recovery of previously undertaken cleanup costs. *Id*. at 486. So, RTX argues, Plaintiffs cannot establish an injury in fact by pointing to "exposure to past releases of contaminants that are no longer occurring,

3

past elevated levels of contaminants that have since been remediated, or even remaining contaminant levels for which exposure controls have been successfully implemented." (ECF No. 467 at 12).

The Court cannot agree. First, the part of the RCRA relied upon by Plaintiffs, 42 U.S.C. § 6972(a)(1)(B), expressly provides for a cause of action against a "*past* or present operator . . . who *has contributed* or who is contributing to the *past* or present" disposal of hazardous waste. *Id*. (emphasis added). Indeed, a different division of this Court has held that subsection (a)(1)(B) is the appropriate avenue for addressing "the harmful effects of past pollution." *Browning v. Flexsteel Indus., Inc.*, 959 F. Supp. 2d 1134, 1150 (N.D. Ind. 2013). That pollution has already occurred does not thwart Plaintiffs' claims, or their standing to bring those claims.

Second, the Court agrees with Plaintiffs that RTX's focus on imminent and substantial endangerment is a merits argument, rather than one addressing standing. As explained in *Forest Park Nat. Bank & Trust v. Ditchfield*, 881 F. Supp. 2d 949, 962-63 (N.D. Ill 2012), "[t]he purpose of the standing inquiry is not to determine whether Defendants have violated RCRA, but rather to determine whether [Plaintiffs have] asserted 'reasonable concerns' about an injury or injuries resulting from Defendants' conduct." Here, there is no dispute that *some* level of hazardous substances has reached Plaintiffs' properties. Whether this level of contamination "results from an ongoing RCRA violation or creates an imminent and substantial threat to human health or environment is immaterial for purposes of the standing inquiry; the unauthorized physical presence of [contamination on Plaintiffs'] property, by itself, constitutes a trespass to property and thus suffices for the purposes of standing." *Id*. Plaintiffs may not have a viable claim under the RCRA, but that's not a standing issue.

**2.**    *Redressability*

RTX next argues that Plaintiffs' claims are not addressable. Essentially, RTX argues that its remediation efforts, taken under the watchful eye of IDEM, leave nothing for this Court to do. Plaintiffs disagree, noting ongoing contamination levels in and around Andrews, Indiana, where Plaintiffs' residences are located.

Again, the Court must agree with Plaintiffs. The RCRA has several statutory bars to citizen suits where state and federal agencies are actively involved in remediation efforts. *See Browning*, 959 F. Supp. 2d at 1152-57 (discussing 42 U.S.C. § 6972(b)(2)(B) and (C)). The parties agree, however, that none of those statutory bars apply. (*See* ECF No. 471). And RTX has rejected the Court's invitation for a hearing on its redressability argument. (*Id*. at 3). The Court is left, then, without a legal or factual basis to find Plaintiffs' claims not redressable for Article III purposes.

**B.**    ***Indiana's Environmental Legal Action Act ("ELA")***

Plaintiffs have also sued under the ELA. That Act, codified at Ind. Code §§ 13-30-9-1 through -8, provides that a "person" may:

> regardless of whether the person caused or contributed to the release of a hazardous substance or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment, bring an environmental legal action against a person that caused or contributed to the release to recover reasonable costs of a removal or remedial action involving the hazardous substances or petroleum.

I.C. § 13-30-9-2. Plaintiffs seek "reasonable costs or removal or remedial action" and attorneys' fees.

RTX presents two arguments. First, it argues that Plaintiffs lack standing because they have not yet incurred remediation costs and therefore cannot show an injury. Second, it argues that it has statutory immunity because of its enrollment in Indiana's Voluntary Remediation Program ("VRP").

5

**1.**     *Removal or Remediation Costs are Required to Show Injury under the ELA*

The Court first notes that another division has already resolved this question adverse to Plaintiffs. In *Hostetler v. Johnson Controls Inc.*, Cause No. 3:15-CV-226-JD, 2021 WL 4477463 (N.D. Ind. Sept. 20, 2021), Judge DeGuilio granted summary judgment on an ELA claim, finding that the ELA contains a "requirement . . . that costs for [a] removal action, etc. be incurred before the lawsuit is filed." *Id*. at *9. *Hostetler* cited the plain language of I.C. § 13-30-9-2, interpreting decisions, and the plaintiffs' failure to "cite a single case where a court allowed an ELA claim to proceed before plaintiffs have incurred some removal or remediation costs." *Id*. at 9-10.

Plaintiffs, similarly, have not cited a single case where a court has allowed an ELA claim to proceed without evidence of removal or remediation costs. Instead, they rely on *Shell Oil Co. v. Meyer*, 684 N.E.2d 504 (Ind. Ct. App. 1997), *aff'd in part* 705 N.E.2d 962 (Ind. 1998). There, the Indiana Supreme Court held that the Indiana Underground Storage Tank Act ("UTSA") "expressly anticipates payment of costs by owners and operators before or after cleanup," 705 N.E.2d at 967. The Supreme Court affirmed the Court of Appeals' holding that to find otherwise would require it to "read into" the UTSA a requirement that a prevailing party could recover "*only after the actions are taken*." 684 N.E.3d at 520 (original emphasis). Plaintiffs argue that, because the ELA and the UTSA are closely related—releases from underground tanks can be pursued under either statute, *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1282-83 (Ind. 2009)—this Court should interpret the ELA similarly "broadly."

The Court concedes that Plaintiffs' argument has some appeal. Like the UTSA, the ELA does not have an express requirement limiting recovery to already-incurred remediation costs. The use of past-tense verbs like "caused" and "contributed" hint at that outcome, but the language is

far from clear. If *Meyer* was the last word on the subject, the Court would likely find in Plaintiffs' favor.

The Court finds, however, that intervening decisions since 1998 have gone for RTX. Consider *Pflanz v. Foster*, 888 N.E.2d 756 (Ind. 2008), another case interpreting the UTSA. There, the Supreme Court found that a contribution claim under the Act did not "accrue" for statute of limitations purposes until "the incurrence of a money obligation that is attributable to the actions of another party." *Id*. at 759. But the Court made it clear that demonstrated harm is an "indispensable element" of a UTSA claim.

> In the American legal system, demonstrated harm is an indispensable element of virtually every type of civil claim. In cases ranging from contract to tort to medical malpractice, a claimant cannot recover a monetary judgment unless he has suffered actual damage. The law does not usually permit monetary recovery for claims solely involving future damages; rather, some damage must have already begun to occur.

*Id*. at 758. Even if, as *Meyer* suggests, the UTSA allows for prospective cost recoupment, *Pflanz* suggests that some harm must be shown before a UTSA claim can be brought.

More compelling is the Indiana Court of Appeals' decision in *Elkhart Foundry & Mach. Co. v. City of Elkhart Redevelopment Comm'm,* 112 N.E.3d 1123 (Ind. Ct. App. 2018). This time interpreting the ELA, the Court of Appeals again held that a cause of action did not accrue for statute of limitation purposes until a plaintiff incurs cleanup costs. *Id*. at 1128. In reaching that conclusion, the Court of Appeals noted that the ELA is an "action for the recovery of cleanup costs, not an action for damage to real property." *Id*. "As such, it would be counterintuitive for the limitation period to start running when the plaintiff merely learns of the contamination, as opposed to when the plaintiff actually incurs a cleanup cost." *Id*. *Elkhart Foundry*, then, is clear that simply knowing about contamination does not trigger the duty to sue. Only the payment of cleanup costs starts that clock.

7

The Seventh Circuit reiterated this conclusion in *Bernstein v. Bankert*, 733 F.3d 190 (7th Cir. 2013). There, multiple clean up orders covering multiple sites were issued by the EPA. The defendants argued that the ELA lawsuit was time-barred, attempting to tie all claims to a cleanup order issued in 1996. The plaintiffs, on the other hand, argued that the 1996 clean up order was for a different site, and entered against a different party, and thus the statutes of limitations for ELA claims related to later clean up orders were unaffected. *Id*. at 220-21.

The Seventh Circuit agreed with the plaintiffs. The Court of Appeals made clear that an "injury" under the ELA is "any costs incurred under a cleanup obligation imposed by the EPA." *Id*. at 220. Explaining the holding in *Pflanz*, the Seventh Circuit clarified that "an obligation to pay may be considered an 'injury' for statute of limitations purposes even before it gives rise to an actual monetary loss." *Id.*

This makes sense and helps explain the conflict between *Meyer* and later cases. It is true, in some cases, that a plaintiff need not show an outlay of cash to demonstrate an injury under the ELA or the UTSA. But those circumstances require an enforceable EPA clean up order. It is enough, then, that there is a legal obligation to clean up, even if cleanup costs have not been expended.

But the Seventh Circuit explained the problems with defendants' position.

> What if the EPA's process had been more drawn out (as is often the case), and the AOCs governing the Third Site cleanup were not issued until 2010, or 2012? According to the argument advanced by the Bankerts, in that case, the statute of limitations would have run entirely on the Trustees' requests for relief before they had even suffered the damages from which relief might be requested. They would have been legally required to bring their action based on nothing but speculation about what sort of cleanup might be ordered in the future at Third Site, what it might cost, what the present discounted value of those potential future costs might be, etc., or else they would lose their right to bring an action at all. The law does not require such clairvoyance. *Furthermore, any action that was filed under such circumstances would raise serious justiciability concerns*, thereby putting plaintiffs

>who have expended their own resources in redressing environmental harms in between a rock and a hard place.

*Id*. at 221 (emphasis added).

It is the reference to justiciability that convinces the Court that Plaintiffs' argument, essentially that the Court should ignore the non-*Meyer* caselaw because it discusses statutes of limitations and not standing, is misplaced. Standing is one element of justiciability. *Tobin for Governor v. Ill. St. Bd. of Elections*, 268 F.3d 517, 527 (7th Cir. 2001). And while it's true that there is more to justiciability than just standing, the repeated references to "injury" in the post-*Meyer* cases persuades the Court that the justiciability issue in bringing an ELA claim prior to incurring cleanup costs is one of standing. The Court, then, concludes that where, as here, Plaintiffs are not under an EPA or state order to commence cleanup activities, cleanup costs are required to show injury for standing under the ELA.

**2.**     *Plaintiffs' Expert Fees Cannot Confer Standing*

As a fallback position, Plaintiffs claim that they "*have* incurred removal and remedial activity costs," pointing to an invoice from one of their experts, Dr. Vasiliki Keramida ("Dr. Keramida"). That invoice, for services rendered in October 2017, represents time Dr. Keramida spent taking "vapor samples from the Town's sewer system throughout Plaintiffs' neighborhood." (ECF Nos. 469 at 9, 469-10 at 2). Plaintiffs argue that, because of those vapor samples, RTX's consultant undertook more remediation activities. (ECF No. 469 at 9).

Plaintiffs point to no case law that would confer standing based solely on expert witness fees. Indeed, the law is the contrary. Addressing "investigation costs" in the context of an environmental action, the United States Supreme Court made it clear that "reimbursement of the costs of litigation cannot alone support standing." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998).

Dr. Keramida's services were rendered after the filing of this suit, and many years after the Indiana Department of Environmental Management ("IDEM") began its oversight. *See Alvey v. Gen. Elec. Co.*, Cause No. 3:20-CV-263-MPB-CSW, 2023 WL 8372044, at *3 ("investigative costs incurred by a private party after [IDEM] has initiated a remedial investigation . . . are not considered necessary because they are 'duplicative' of the work performed by [IDEM]"). They were billed to Plaintiffs' counsel, designated as Project "United Technologies Corporation – Litigation." And, no doubt, Plaintiffs will seek to recover the billed amount as damages if they succeed. *See* 42 U.S.C. § 6972(e) (allowing the court to award "costs of litigation" including "expert witness fees" under the RCRA). Dr. Keramida's fees were no doubt "costs of litigation," regardless of whether they had some salutary use to RTX. Plaintiffs point to no authority holding otherwise. Dr. Keramida's fees, then, cannot confer standing under the ELA. Plaintiffs have failed to show an injury under the ELA, lack standing under the statute, and the claims under the ELA will be dismissed.

**C.**     ***Negligence***

Plaintiffs next present Indiana common law negligence claims. Those claims come in three flavors: a personal injury claim on behalf of Opal Millman ("Millman") for causing her trigeminal neuralgia ("TN"), a personal injury claim on behalf of Eric Powell ("Eric") and Laury Powell ("Laury") (collectively "the Powells") for an increased risk of health issues, and a claim on behalf of all Plaintiffs for a diminution in the value of their properties.

For each claim, RTX asserts that Plaintiffs have failed to allege an injury in fact that would support standing. Plaintiffs disagree, arguing that simple exposure to the chemicals released by RTX is enough for standing and, even if exposure isn't enough, that they have alleged injuries flowing from that exposure.

**1.**     *Mere Exposure does not Confer Standing*

The building blocks for Plaintiffs' exposure argument are an army of three (or more)-decades-old cases that, admittedly, talk around the idea that exposure to environmental toxins alone satisfies the requirement for an injury-in-fact. *See*, *e.g.*, *Duke Power Co v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 73-74 (1978) ("emission of non-natural radiation into appellees' environment would also seem a direct and present injury"). They argue that these cases are still good law and have not been overruled by *TransUnion*. In fact, Plaintiffs argue that *TransUnion* does not apply, pointing to case law distinguishing standing in data breach cases from toxic torts. *See*, *e.g.*, *Reilly v. Ceridian Corp.*, 664 F.3d 38, 45 (3d Cir. 2011).

But *TransUnion* is not the only hurdle for Plaintiffs. Rather, most of Plaintiffs' authorities pre-date not just *TransUnion*, but also *Lujan* and *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). To accept Plaintiffs' authorities, then, the Court would have to ignore the entirety of modern Supreme Court standing jurisprudence. Without some direction from the Seventh Circuit or the Supreme Court, this Court will not be so bold.

And if the triumvirate of *Lujan*, *Spokeo*, and *TransUnion* stand for anything, they stand for the idea that an offense without an injury does not grant entry to federal court. *See Lujan*, 504 U.S. at 560 (requiring an "injury in fact"); *Spokeo*, 578 U.S. at 339 ("Congress cannot erase Article III's standing requirements by granting the right to sue to a plaintiff who would not otherwise have standing"); *TransUnion*, 594 U.S. at 426-27 (noting the "important difference" between "(i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law"). The simple fact of a legal violation, whether statutory or common law, does not confer standing.

Rather, it is the injury, particularized and concrete, that allows an individual plaintiff to have her case heard.

Sadly, this conclusion is nearly mandatory given the environment we all must face. As the Supreme Court recognized nearly 30 years ago, in an observation all the more true today, "contacts, even extensive contacts, with serious carcinogens are common." *Metro-N. Commuter R. Co. v. Buckley*, 521 U.S. 424, 434 (1997). Indeed, genotoxins—agents capable of damaging genetic material—are everywhere, and include extreme temperatures, ultraviolet light, food additives, tobacco, alcohol, parasites, viruses, and fungi. *See* David Lopez-Romero, et al., *Evidence of Some Natural Products with Antigenotoxic Effects. Part 2: Plants, Vegetables, and Natural Resin*, NUTRIENTS, 2018 at 12. To hold that simple exposure to a genotoxin (Plaintiffs' preferred nomenclature) is enough to convey standing would make a plaintiff, and a defendant, out of everyone and everything.

Nor does the Court find the distinction between data breaches and toxic torts to be decisive. The Court is mindful of the Third Circuit's decision in *Reilly*, but it is the Seventh Circuit, not the Third, that holds sway here. And the Seventh Circuit has analogized toxic tort and data breach cases when discussing the injury requirement. *See Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 638-39 (7th Cir. 2007). This Court has no reason, then, the believe that *TransUnion* and *Spokeo* are inapplicable simply because of the nature of the dispute.

Without any injury, an individual exposed to a toxic substance is little different from the victim of a data theft. Both have suffered an intrusion. Both subjectively view themselves as worse off than they were before. And both are, in some sense, objectively worse off. But the Supreme Court demands more, as does the Indiana Supreme Court, *see AlliedSignal, Inc. v. Ott*, 785 N.E.2d 1068, 1075 (Ind. 2003) ("injury . . . does not occur upon mere exposure to (or inhalation of)

asbestos fibers"), and so will the Court. The Court finds that simple exposure to environmental toxins does not satisfy the injury-in-fact requirement for standing.

**2.**   *The Powells' Increased Risk of Harm is not an Injury-In-Fact*

The issue then becomes whether the Powells' claimed risk of future harm, that is, an increased risk of cancer, is an injury-in-fact for purposes of standing. Plaintiffs present one binding authority, *Alexander v. Scheid*, 726 N.E.2d 272 (Ind. 2000), and represent that the Indiana Supreme Court held there that "'loss of healthy tissue' (*i.e.*, healthy DNA) satisfies Article III standing for negligence claims." (ECF No. 469 at 10). The Court disagrees with Plaintiffs' characterization of *Alexander* and finds that Plaintiffs have not satisfied the injury-in-fact requirement.

In *Alexander*, the plaintiff sued her orthopedic surgeon under Indiana's medical malpractice act for failing to spot a cancerous lung tumor in a pre-surgery x-ray. She claimed, among other things, that the surgeon's negligence had resulted in "an increased risk of harm and decreased chance of long-term survival," later dubbed "loss of chance." *Id*. at 274. The trial court granted summary judgment for the doctor, which the Indiana Court of Appeals affirmed, finding that the plaintiff had not suffered a compensable injury under Indiana law. The Indiana Supreme Court accepted transfer, in part, to decide whether "Indiana law permit[s] [the plaintiff] to recover for an increased risk of incurring a life shortening disease under the 'loss of chance' doctrine or otherwise?" *Id*. at 273-75.

The Indiana Supreme Court determined that "loss of chance" was compensable but characterized it as "a description of the injury [rather than] a term for a separate cause of action or a surrogate for the causation element of a negligence claim." *Id*. at 279. And, as Plaintiffs' note, the Indiana Supreme Court found that the loss of chance was "not too remote or speculative an injury to preclude recovery, and [the plaintiff] should not be forced to wait until she has suffered a

13

relapse to proceed with a cause of action for what is essentially a daily threat of impending death, or to wait until her husband, on her behalf, is left with a wrongful death claim." *Id*. at 281. All that supports Plaintiffs' reading.

But everything in between those quotes demonstrates the flaw in Plaintiffs' argument. The vital aspect of *Alexander* that separates it from the Powells' claims is that the plaintiff in *Alexander* did not rely only on "loss of chance" as her injury. Rather, as the Indiana Supreme Court held, the plaintiff "pointed to evidence that would support a finding of *both present injury* and increased risk of harm. We agree with the authorities that find these sufficient to maintain a cause of action for an increased risk of harm." *Id*. (added emphasis). The Supreme Court later found that the plaintiff "has suffered physical injuries, including the growth of a cancerous tumor, the destruction of healthy lung tissue[1], and the collapse of a lung." *Id*. The plaintiff in *Alexander* had a presently existing, diagnosable condition that caused the loss of chance. The Powells do not, and *Alexander* is inapplicable.

Far more applicable is the Indiana Supreme Court's decision three years later in *Allied Signal*. There, the Indiana Supreme Court analyzed the statute of repose for industrial asbestos claims. Deciding a substantively similar question to the one here—whether a cause of action accrues at the time of exposure or at the time of an asbestos-related illness—the Supreme Court held:

> [W]ith respect to asbestos claims under Section 1, a cause of action accrues at that point at which a physician who is reasonably experienced at making such diagnoses could have diagnosed the individual with an asbestos-related illness or disease. In this regard, we disapprove Judge Barnes's and the trial court's formulations to the extent that they hold that a cause of action accrues when exposure to asbestos occurs even though a disease does not manifest itself until many years later. In our view, it is only when the disease has actually manifested itself (and therefore could

---

[1] The full quote shows just how much heavy lifting the parenthetical was doing in Plaintiffs' description of *Alexander*'s holding. *Alexander* was not talking about the loss of "healthy DNA" when it discussed "loss of healthy tissue." Rather, it was describing the consumption of healthy lung tissue by a cancerous tumor.

14

>be diagnosed by a reasonably experienced physician) that the cause of action accrues.

*Id*. at 1075; *see also id.*, fn. 8 (collecting cases) ("subclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law"). The Court finds that Indiana would not find standing for the Powells before an illness or disease caused by RTX's actions manifested, and so holds today.

The Court also finds support for its conclusion in Plaintiffs' evidence. Plaintiffs accuse RTX of asking the Court to "ignore all of that evidence," but the Court believes that a review of Plaintiffs' evidence shows a lack of a concrete, particularized, and actual or imminent injury. To be sure, Plaintiffs' evidence teems with commentary on what the chemicals released by Defendants *can do* in the body. *See* ECF No. 463 at 3-7. But that evidence is short on what those chemicals *have actually done* in the body of the Powells. Indeed, Plaintiffs' experts concede that they "don't know that there's any tests . . . that would tell you" the extent to which, or even if, the Powells' DNA has been harmed by the chemicals. (ECF No. 469-15 at 4). Since genotoxicity is the primary, if not only, basis on which the Powells base their claims of current injury, the inability to show genetic changes strikes the Court as damning.

The Court concedes the harshness, and perhaps economic inefficiency, of its ruling. But in a world where the human body is exposed to cancer-causing agents daily, it strikes the Court as equally inefficient to throw open the courthouse doors based on a probabilistic risk of future harm. The Court finds that the Powells lack standing to pursue personal injury negligence claims and dismisses those claims accordingly.

15

**3.**     *Plaintiffs have Standing to Pursue the Remaining Negligence Claims*

Plaintiffs' remaining claims require far less analysis. RTX challenges the Estate of Opal Millman's ("Estate") standing to pursue a claim for Opal's TN. But those arguments are challenges to Plaintiffs' experts, not any of elements of standing. (ECF No. 467 at 26-27). The Court may ultimately conclude that Plaintiffs' causation evidence is lacking, but that's not a standing issue.

The same can be said of RTX's arguments that Plaintiffs lack standing to pursue damages for the diminution of their property values. It argues that Plaintiffs have no evidence of damages other than their "self-serving testimony." (*Id*. at 27). But as RTX concedes in a footnote, "Indiana law allows a property owner to testify to the value of his property, provided that he can offer some factual basis for his valuation; with that proviso, it is regarded as a matter within his personal knowledge." *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 675 (7th Cir. 2009).[2] At this point, Plaintiffs' testimony strikes the Court as enough.

**D.**     ***Plaintiffs Lack Standing to Pursue a Claim for Negligent Infliction of Emotional Distress ("NIED") Based on Risk of Future Injury***

Next, Plaintiffs bring a claim for NIED. They assert that the exposure to the chemicals released by Defendants was a "direct bodily impact," causing "serious emotional trauma." (ECF No. 156 at 27-28). RTX challenges standing on this claim, arguing that Indiana does not recognize an NIED claim based on exposure to contaminants.

Again, the Court must agree with RTX. The uniform position the cases cited in the parties' briefs, both from this Court and from Indiana courts, supports RTX's position. *See Holiday v. E.I.*

---

[2] But Plaintiffs should be mindful of the rest of the *Cunningham* holding. Addressing the evidence needed to prove damage to real estate values caused by contamination, the Seventh Circuit stated that the "critical question is how much [the plaintiffs] could have sold the building for had it not been for the contamination," a question the Court of Appeals said required "evidence by a real estate agent or a real estate appraiser to establish the effect of the contamination on the value of their property." *Cunningham*, 569 F.3d at 676. Based on the current evidence presented, the Court doubts that Plaintiffs can prove a loss of value based on their own testimony. That's not a standing issue, however.

16

*du Pont de Nemours and Co.*, Cause No. 2:16-CV-525-PPS-JPK, 2023 WL 6160832, at *9-12 (N.D. Ind. Sept. 20, 2023); *Hostetler*, 2021 WL 5087261, at *15-17; *Adams v. Clean Air Sys., Inc.*, 586 N.E.2d 940, 492 (Ind. Ct. App. 1992) ("the mere possibility that the defendant's action or inaction placed plaintiffs in a position to possible [sic] sustain injury is not cognizable"). And while Plaintiffs seek to distinguish these cases, they point to none of their own that would allow their NIED claim to proceed. The Court has no legal basis to conclude that Plaintiffs have standing to pursue an NIED claim based on fear of future injury and dismisses the claim accordingly.[3]

### E.  *Plaintiffs have Standing to Pursue Trespass and Nuisance Claims*

Finally, the parties dispute standing on the Powells' claims for trespass and nuisance. RTX disputes standing, relying on cases from the Fourth Circuit that would require either direct physical impact or levels of contaminants above IDEM screening levels. (ECF No. 467 at 30-31).

On these claims, the Court must side with the Powells. Whatever the law may be in the Fourth Circuit, the Indiana Supreme Court, in discussing potential common law liability for release of contaminants, stated that "[c]ontamination finding its way onto the property of the Landowners has elements of both a trespass and a nuisance." *Meyer*, 705 N.E.2d at 978; *see also Lever Bros. v. Langdoc*, 655 N.E.2d 577, 581-82 (Ind. Ct. App. 1995) (trespass). The Court finds that the alleged release of contaminants by RTX into the Powells' property confers standing onto the Powells to pursue both trespass and nuisance claims.

### III. Claims Against the Williams Defendants

The Court incorporates, by reference, the discussion of the claims against RTX here. If Plaintiffs have, or lack, standing to bring the above claims against RTX, the Court finds that

---

[3] RTX also challenges Opal's standing to bring a NIED claim based on her husband's NT diagnosis. (ECF No. 467 at 30). But Plaintiffs concede that they "do not assert this as an independent NIED claim," (ECF No. 469 at 15), so the Court will not address this argument.

standing for the claims rise or fall for the same reasons against the Williams Defendants. The Williams Defendants raise additional objections to standing, which the Court will address here.

**A.**     *Traceability*

First, the Williams Defendants argue that Plaintiffs have no evidence that their injuries are "fairly traceable" to them. This argument essentially boils down to a repeat of the arguments presented in the Williams Defendants' *Daubert* motions. (*See* ECF No. 466 at 18) ("Plaintiffs lack admissible expert testimony tracing their alleged injuries to the Williams Corp. Entities.")

To demonstrate traceability, Plaintiffs must allege facts showing a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. "Standing is not always lost when the causal connection is weak, and a defendant's actions need not be 'the very last step in the chain of causation.'" *Doe v. Holcomb*, 883 F.3d 971, 978 (7th Cir. 2018) (citations omitted). The injury, however, "must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up).

Again, the Court reads the Williams Defendants' traceability arguments as another salvo against Plaintiffs' experts. But the Court has already found it appropriate to withhold a ruling on the many *Daubert* motions until the standing issues are resolved. (ECF No. 457 at 3). So the Court will not delve into those issues now. Instead, it is sufficient to say that, if Plaintiffs' experts are believed, Plaintiffs have shown injuries "fairly traceable" to the Williams Defendants to establish that prong of the Article III standing analysis.

**B.**     *The Estate's Standing to Bring a RCRA Claim*

The Williams Defendants' last bespoke argument is that the Estate of Opal Millman lacks standing to pursue a claim under the RCRA. The Williams Defendants argue, in essence, that

18

because the RCRA is a forward-looking statute, the Estate should be unable to recover for past harms done to Millman.

This argument is not without some appeal. Indeed, as discussed above the Supreme Court has stated that the purpose of the RCRA is to "minimize the present and future threat to human health and the environment.'" *Meghrig*, 516 U.S. at 483. But at least one federal court has concluded that RCRA claims are survivable. *Jim 72 Props., LLC v. Montgomery Clearners*, 151 F. Supp. 3d 1092, 1097-1101 (C.D. Cal. 2015). The Williams Defendants provide no contrary authority, or any reason for this Court to reach a different conclusion. The Court finds, then, that the Estate can bring whatever RCRA claims that could have been brought by Millman.

**IV.     Conclusion**

For these reasons, the Court DIRECTS the Clerk to enter judgment for Defendants and against Plaintiffs on the following Counts of Plaintiffs' Third Amended Complaint (ECF No. 156):

(1)     Count III – Negligence, to the extent that it seeks damages arising from the Powells' increased risk of future harm.

(2)     Count IV – Environmental Legal Action.

(3)     Count V – Negligent Infliction of Emotional Distress.

The Court further finds that this judgment should be final under Fed. R. Civ. P. 54(b), as there is no just reason for delay.

The Court ORDERS the parties to meet and confer and then file a status report with the Court within 30 days identifying those *Daubert* motions which must still be resolved following this Opinion and Order. The status report should identify the motions by title *and* by docket number.

SO ORDERED on December 5, 2024.

                                              s/ *Holly A. Brady*
                                              CHIEF JUDGE HOLLY A. BRADY
                                              UNITED STATES DISTRICT JUDGE