**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| OPAL MILLMAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 1:16-CV-312-HAB |
| | ) | |
| RTX CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiffs Opal Millman[1], Eric Powell, and Laury Powell brought this action against Defendants Lear Corporation EEDS and Interiors, CP Product LLC, and RTX Corporation (the "RTX Defendants")[2] and Defendants L.D. Williams, Inc. and LDW Development LLC (the "Williams Defendants"), alleging common law and statutory injuries stemming from the release of hazardous chemicals in and around the town of Andrews, Indiana.

The parties have filed a slew of motions challenging each other's experts. Now before the Court is the RTX Defendants' motion to exclude the expert testimony and reports of James T. Wells, Ph.D., P.G., Kathleen Gilbert, Ph.D., Kenneth Spaeth, M.D., Paul Sadin, and Zachary Torry, M.D. (ECF No. 328).[3] The Court will address each expert in turn. For the reasons explained below,

---

[1] On September 26, 2023, Plaintiffs filed a suggestion of death as to Millman along with a motion to substitute Linda Phillips, the personal representative of Millman's estate. (ECF Nos. 449, 450). The Court granted the motion. (ECF No. 451).

[2] This motion was filed by Defendants Lear Corporation EEDs and Interiors, CP Product LLC, and Raytheon. On August 1, 2023, Raytheon filed a notice of name change to RTX Corporation, and the Court subsequently ordered the caption of the case to be amended and all references to Raytheon Technologies Corporation in previous pleadings and filings deemed references to RTX Corporation. (ECF Nos. 447, 448).

[3] The RTX Defendants have filed separately docketed memoranda in support for each of the experts they wish the Court to exclude. For ease of reference the Court will refer to the briefing for each as "[Expert Name] Mem.", "Resp. to [Expert Name] Mem.," and "[Expert Name] Reply."

the Court grants the motion in part and denies the motion in part. The Court grants the motion with respect to Dr. Zachary D. Torry's opinions as to the reasonableness of the Plaintiffs' emotional distress damages. The Court denies the motion with respect to Paul Sadin, Dr. James Wells, Dr. Kathleen Gilbert, Dr. Kenneth Spaeth, and the other opinions offered by Dr. Torry.

## I.    Introduction

### A.    Factual and Procedural Background

The Court presumes familiarity with the facts and procedural history underlying this case, which have been set forth in previous orders, *see* ECF Nos. 66, 321, but briefly summarizes them here.

This case arises out of Defendants' admitted release of hazardous chemicals in and around the town of Andrews, Indiana. The releases flowed from two facilities: a manufacturing facility owned by the RTX Defendants' corporate predecessor ("UTA Facility") and a gas station now owned and operated by the Williams Defendants ("Gas Station"). In the early 1990s, the UTA Facility entered into Indiana's Voluntary Remediation Program to address the presence of trichloroethylene ("TCE") and other volatile organic compounds ("VOCs") found in the soil and groundwater both on- and off-site—remediation work which continues to this day. The remediation efforts include the installation of an air stripper on the town's municipal water supply, continued monitoring of the town's water supply, ongoing vapor testing and mitigation of structures within the town, and other environmental remedial actions. In 1993, the Gas Station was entered into

---

This motion also seeks the exclusion of Plaintiff's expert Al Westerman, Ph.D. Mot. at 1-2. Because the RTX Defendants did not include a memorandum with argument regarding Westerman, but rather refer to a joint motion to exclude Westerman filed by all Defendants (ECF No. 353), the Court will consider Westerman's report and testimony in a separate opinion on that joint motion.

IDEM's Leaking Underground Storage Tank Program. Since then, remediation efforts have been undertaken to address the release of petroleum products from the underground storage tanks.

Plaintiffs' homes are located directly across the street from the Gas Station and downgradient from the UTA Facility. As a result of indoor air testing conducted at Millman's residence beginning in July 2006, a vapor mitigation system was installed in her crawlspace. Testing of the Powells' home, which began in 2013, has always shown VOC levels below applicable IDEM limits, so no vapor mitigation system has been installed in their home. Millman claims that exposure to the VOCs released by Defendants caused her to develop trigeminal neuralgia, a chronic condition affecting the trigeminal nerve. The Powells allege a general fear and increased risk of potential future health effects. Plaintiffs bring claims for common law trespass, nuisance, and negligence, as well as federal claims under the Resource Conservation and Recovery Act ("RCRA").

### B.    Experts

Five of Plaintiffs' experts are at issue in this motion: Paul Sadin, James T. Wells, Ph.D., P.G., Kathleen Gilbert, Ph.D., Kenneth Spaeth, M.D., and Zachary Torry, M.D.

Sadin is a historian. Plaintiffs engaged him to conduct research into the "history of environmental contamination associated with TCE use and waste disposal, with a particular emphasis on chlorinated solvent use in industrial degreasing operations such as those conducted at the UTA plant in Andrews." Sadin Rpt. at 2 (ECF No. 336-15). He offers opinions including:

- The scientific community and the chemical industry published or otherwise disseminated their knowledge about the toxic hazards, primarily from inhalation, of TCE in the 1940s;

- Scientific publications in the United States regarding potential or documented cases of groundwater contamination from organic industrial chemical wastes began to appear in the 1950s and early 1960s;

- By the time UTA took over operation of the Andrews plant in 1974, experts in the scientific community, the chemical industry, and in federal agencies recognized the

threat that surface disposal of industrial chemical waste products, whether in landfills or at plant facilities, was posing to groundwater supplies; and

- Efforts to halt unregulated disposal of industrial chemical wastes to water and ground surfaces, such as the type of TCE waste disposal at the UTA plant in Andrews during the 1970s, which James Wells described in his expert report, were well underway prior to congressional enactment of laws limiting hazardous waste disposal.

Dr. Wells, a professional geologist with a PhD in Geological Sciences, was engaged "to provide scientific input and expert opinions concerning groundwater, soil, soil gas and indoor air contamination originating from [the UTA Facility and the Gas Station]." Wells Rpt. at 1 (ECF No. 335-10). He offers opinions including:

- United Technologies released large quantities of chlorinated chemicals and Andrew's Dairy gas station released large quantities [of] petroleum chemicals, which collectively caused extensive soil, soil gas, surface water and groundwater contamination, much of which remains to this day;

- The Millmans and Powells were exposed to toxic chemicals from Andrews Dairy and UTC in their homes;

- The Millmans and the Powells were exposed to contamination from Andrews Dairy and UTC in their drinking water and by other exposure pathways as they went about their daily lives in Andrews;

- Using groundwater, soil, vapor, and indoor air data collected over the years, it is possible to reconstruct indoor air exposures in each of the homes over the periods of occupancy of the plaintiffs;

- The releases of VOCs into the environment from UTC created subsurface contamination that presents an imminent and substantial endangerment to human health and the environment within the meaning of the Resource Conservation and Recovery Act (RCRA); and

- Based on currently available data, it will cost approximately $39.8 million to conduct the necessary remediation to clean up this UTC site in a manner that will be permanently protective of human health and the environment.

Dr. Gilbert and Dr. Spaeth were both engaged to provide testimony as to causation. Dr. Spaeth, a medical doctor and specialist in Occupational and Environmental Medicine, was

4

engaged to offer opinions regarding Opal Millman and the health effects of exposure to benzene, TCE, and vinyl chloride ("VC"). Spaeth Millman Rpt. at 1-3 (ECF No. 337-3). Regarding Opal Millman, his conclusions include that "the elevated levels of trichloroethylene present in her home and throughout Andrews, IN resulted in Opal Millman experiencing cumulative exposure with sufficient duration, frequency and intensity such that TCE is a significant contributing factor in her developing trigeminal neuralgia." *Id.* at 29-30. Regarding the Powells, his conclusions include that "[b]y virtue of the years spent in Andrews, IN, [the Powells] unknowingly breathed and also ingested benzene, trichloroethylene and vinyl chloride. Such long-standing exposure resulted in significant body burden of these chemicals which has put [them] at increased risk of a variety of cancers and other health risks associated with these pollutants." Spaeth Powell Rpt. at 22 (ECF 335-20).

Dr. Gilbert, who has experience in immunology, immunotoxicology, and human health risk toxicology, was engaged to provide opinions concerning the likelihood that exposure to TCE and other compounds including VC, cis-1, 2-DCE, and benzene impacted the health of all three Plaintiffs. Gilbert Rpt. at 1 (ECF No.335-21). She offers opinions including:

- Exposure to the chemical pollutants (specifically TCE, vinyl chloride, benzene, and cis-1,2-DCE) found in Andrews, Indiana, can have adverse effects on human health;

- The toxicity of the TCE, benzene, and vinyl chloride found in Andrews is likely increased by their co-exposure;

- Exposure to TCE, benzene and vinyl chloride had adverse health effects on Opal Millman and promoted the generation of trigeminal neuralgia;

- Exposure to TCE, benzene and vinyl chloride has increased the chances that Eric Powell will experience adverse health effects;

- The fact that his exposure to TCE and vinyl chloride began at an early age has further increased the chances that Eric Powell will experience adverse health effects; and

- Chronic exposure to multiple chemicals increased the likelihood that Laury Powell will at some point experience toxicity.

Dr. Zachary D. Torry is a medical doctor specializing in psychiatry and forensic psychiatry. Torry Rpt. at 2 (ECF No. 337-8). Plaintiffs engaged him to evaluate Plaintiffs and provide an opinion as to whether exposure to hazardous chemicals and the associated risks of imminent danger have caused Plaintiffs to experience emotional distress. Regarding Millman, Dr. Torry offers opinions including:

- Millman's exposure to hazardous chemicals has resulted in severe emotional harm;

- Millman's exposure to the hazardous chemicals while living in the house located at 156 N. Main Street in Andrews, Indiana since 1968 is the direct cause of her emotional distress;

- Her fear and emotional distress is reasonable and any reasonable person in her situation would experience a similar amount of distress; and

- [B]ased on the severity of symptoms, her level of impairment, her age, and the constant threat of harm, she has low prospects of ever being without residual psychiatric symptoms.

Regarding the Powells, he offers opinions including:

- The Powells' exposure to hazardous chemicals has resulted in severe emotional harm;

- The Powell's exposure to the hazardous chemicals while living in the house located at 148 N. Main Street in Andrews, Indiana is the direct cause of their emotional distress;

- Their fear and emotional distress is reasonable and any reasonable person in their situation would experience a similar amount of distress; and

- [B]ased on the severity of symptoms, their level of impairment, their age, and the constant threat of harm, they have low prospects of ever being without residual psychiatric symptoms.

The Court will address each expert individually and in more detail below.

6

**II.      Legal Standard**

The admissibility of expert testimony under the Federal Rules of Evidence is governed by the well-known and oft-cited standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

   (b) the testimony is based on sufficient facts or data;

   (c) the testimony is the product of reliable principles and methods; and

   (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

Fed. R. Evid. 702.  To implement this evidentiary standard, the district court acts as a "gatekeeper" to "ensure that any and all scientific testimony. . . is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.  *Daubert* provides four non-exhaustive considerations that bear on this inquiry: (1) whether a "theory or technique . . . can be (and has been) tested;" (2) whether the "theory or technique has been subjected to peer review and publication;" (3) the technique's "known or potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation;" and (4) whether the theory or technique has found "general acceptance" within the scientific community.  *Id.* at 593-94. This standard applies to all forms of expert evidence, *Kumho Tire co. v. Carmichael*, 526 U.S. 137, 147 (1999), and the proponent of the evidence "bears the burden of demonstrating that [it] satisfies [*Daubert*] by a preponderance of the evidence." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017).  Ultimately, "a district judge asked to admit scientific evidence must determine whether the evidence is genuinely

scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).

District courts in the Seventh Circuit conduct a three-step analysis before admitting expert testimony: they "must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-Packard Co*., 877 F.3d 771, 779 (7th Cir. 2017) (internal quotation marks omitted). In short, the Court must evaluate (i) the proffered expert's qualifications, (ii) the reliability of his or her methodology, and (iii) the relevance of his or her testimony. *Id.*

## III.    Admissibility of the Expert Testimony and Reports

### A.    Paul Sadin[4]

The RTX Defendants argue that Sadin's testimony and reports are inadmissible under Fed. R. Evid. 702 on all three grounds: that he is unqualified, that his methods and opinions are unreliable, and that his testimony will not assist a finder of fact in this matter.  For the reasons outlined below, the Court denies the motion to exclude as to Sadin.

### 1.    Qualifications

"[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether [an] expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).  "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's

---

[4] The RTX Defendants filed their memorandum in support of excluding Sadin ("Sadin Mem.") at ECF No. 329. Plaintiffs filed their response at ECF No. 386 ("Resp. to Sadin Mem."). The RTX Defendants filed their reply at ECF No. 400 ("Sadin Reply"). Sadin's report can be found at ECF No. 336-15 ("Sadin Rpt."). Excerpts from Sadin's Deposition can be found at ECF No. 336-16.

testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (internal quotation marks omitted). "The question . . . is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question." *Id.* at 617 (internal quotation marks omitted).

The RTX Defendants argue that Sadin is not qualified to present testimony on the history of environmental hazards associated with the use and disposal of TCE. Sadin Mem. at 3-7.  They argue that Sadin has no education in any discipline relevant to this dispute, as his degrees are in psychology, social work, and history. *Id.* at 3. They point out that he has no formal training and is not a member of any professional society or organization relating to the chemical industry, toxicology, chemical manufacturers, or industrial manufacturers. *Id.* at 3-4.  They also emphasize his lack of experience with the use or disposal of TCE in an industrial setting and the fact that he has not conducted any independent research on the use or disposal of chlorinated solvents or VOCs or published any peer-reviewed literature on the use and disposal of TCE. *Id.* at 6.

In response, Plaintiffs acknowledge that Sadin's background is in history and that he has no formal education or training in environmental toxicology or related fields but make two arguments as to why that does not disqualify him from serving as an expert in this case. Resp. to Sadin Mem. at 2-6. First, Plaintiffs assert that the RTX Defendants are using the wrong standard in evaluating Sadin's qualifications, arguing that an expert historian "must possess skill and experience in *historical research*—not necessarily in the technical substantive field underlying that research." *Id.* at 11-12.  Second, Plaintiffs contest the RTX Defendants' characterization of Sadin as lacking relevant experience under that standard. The Court agrees with Plaintiffs in both respects.

Plaintiffs are correct that the standard for assessing the qualifications of a historical expert is different from the standard for assessing the qualifications of a scientific or technical expert. Experts offered to provide historical context or to interpret a historical record do not need expertise in the underlying subject area in the same way technical experts do. Rather, they need only be trained in historical interpretation. *See Cyprus Amax Mins. Co. v. TCI Pac. Commc'ns Inc.*, 2014 WL 693328, at *4 (N.D. Okla. Feb. 21, 2014) ("Dr. Stevens' opinions do not require her to possess a law degree or any special business experience, because her opinions are simply intended to show what factual findings the historical record tends to support . . . . This opinion is well within her expertise as a historian . . . ."); *United States v. Newmont USA Ltd.*, 2007 WL 4856859, at *2 (E.D. Wash. Nov. 16, 2007) ("That [the expert] is a historian, as opposed to an expert in the specific areas [at issue] is not disqualifying in this case, as his background appears to provide sufficient expertise upon which his opinions, as a general matter, are based."); *Burton v. Am. Cyanamid*, 2018 WL 3954858 (E.D. Wis. Aug 16, 2018). In *Burton*, for example, the plaintiffs offered two expert historians to offer opinions as to the history of lead-based pigments and manufacturers' record of downplaying the associated health risks. 2018 WL 3954858, at *2-3. The Court declined to exclude the opinions even though the experts did not possess degrees in chemistry, toxicology, or industrial hygiene, recognizing their credentials as historians. *Id.* at *4.

The Court finds that, under this standard, Sadin is qualified to provide his opinions in this case. The RTX Defendants do not dispute Sadin's qualifications as a historian. Sadin has both a Bachelor of Arts and a Master of Arts in History. Sadin Rpt. at A-1. He currently works as a Senior Historian at Historical Research Associates. *Id.* at 1. The RTX Defendants provide no case law to support their contention that Sadin's lack of education or training in geology, environmental toxicology, or other related fields, or his lack of experience working in an operating manufacturing

facility where industrial degreasers were used, disqualifies him from serving as a historical expert here.

As Plaintiffs point out, Sadin does have background in researching contaminated sites, including investigations into manufacturing facilities. *See* Resp. to Sadin Mem. at 3; Sadin Rpt. at A-1-A-3. Plaintiffs mention two research projects in particular, both addressed by Sadin during his deposition: the first was a project regarding "chlorinated solvents that were used in airfield [that] had entered the groundwater"—chlorinated solvents that included TCE—, and the second was a project addressing allocation of responsibility for the cleanup of an industrial waterway involving an aircraft manufacturing facility that was contaminated with TCE and other chlorinated solvents. *Id.* at 4. As Sadin's opinions are limited to summarizing and drawing conclusions from historical documents, the Court is satisfied that his education and training as a historian, combined with his experience with environmental contamination projects, qualify Sadin to provide his opinion in this case. If the RTX Defendants believe Sadin's experience is insufficient, they may cross-examine him as to his qualifications at trial.

### 2.    Methodology

The RTX Defendants argue that Sadin's methodology and expert opinion testimony are scientifically unreliable and should be excluded for that reason as well.

First, regarding Sadin's methodology, the RTX Defendants object to the fact that Sadin's list of sources did not include "any documents or information relating to the actual operations of the former UTA Facility or the use and disposal of TCE there," which they state is "the very subject matter of Sadin's opinions." Sadin Mem. At 8.  Second, the RTX Defendants argue that Sadin's opinions about when groundwater contamination by TCE was generally recognized are "simply incorrect." *Id.* at 9-15. They argue that Sadin "cherry-picked" his sources, that his conclusions are

11

contradicted by other published materials, and that one of his primary sources has been "roundly criticized." *Id.*

Underlying this section of the brief is the same notion as the Court dismissed earlier in this opinion—that Sadin's lack of education and experience in TCE contamination disqualifies him from acting as an expert in this case. As Plaintiffs point out in their response, Sadin's methodology appears to be appropriate for a historian expert. He first determined what the universe of relevant documents might be and then looked for both primary and secondary source documents before reviewing the materials, assessing their relevance and credibility, and ultimately synthesizing them for his report and opinion. *See* Resp. to Sadin Mem. at 14-15. This is an appropriate methodology for a historical expert. *See, e.g., Burton*, 2018 WL 3954858, at *5 ("Proper historical work involves surveying the full array of available sources, evaluating the reliability of the sources, and thus providing a basis for a reliable narrative about that past.") (internal quotation marks omitted). And regarding the RTX Defendants' complaint that Sadin did not include data relating to the actual operations of the former UTA Facility, as Plaintiffs note, "a Site-specific assessment was outside the scope of Sadin's assignment in this case." Resp. to Sadin Mem. at 16.

To the extent that the RTX Defendants take issue with the accuracy of Sadin's testimony, and with the sources he used to draw his conclusions, they may cross examine him at trial. *See Smith*, 215 F.3d at 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment.").

### 3.   Litigation-Driven Nature of the Testimony

The RTX Defendants also argue that Sadin's opinions should be excluded because he developed them expressly for purposes of testifying. As evidence for this argument, they state that Sadin confirmed "that key sections in his report, like the section entitled 'Background on TCE Production and Use' were topics he had never researched before and had never written about prior to being retained in this litigation." Sadin Mem. at 15. This argument is not well-taken.

As Plaintiffs note in their response, this is not Sadin's first time investigating the history of TCE disposal. Resp. to Sadin Mem. at 22-23. In his deposition, Sadin explains that he has done work for projects involving historical TCE contamination in the past. Sadin Dep. at 31-33. The fact that he has not prepared a background on TCE production and use in any other project does not disqualify him from preparing one here; indeed, requiring that level of specificity in prior experience would be unreasonable.

### 4.       Danger of Prejudice

Finally, the RTX Defendants argue that the probative value of Sadin's expert testimony is so minimal that, even if otherwise admissible, it should be excluded due to significant danger of unfair prejudice, confusion of the issues, or misleading the jury. Sadin Mem. at 15.  They assert: "Considering that Sadin's testimony is limited to simply providing or reading from historical texts and publicly available documents, his opinion testimony as a purported 'expert would be misleading and confusing to the jury since those historical texts and documents speak for themselves and could be introduced through other means, if admissible and appropriate." *Id.*

The Court disagrees. If this were a reason to exclude evidence as overly prejudicial, there would be no place for historical experts in litigation.  As the court stated in *Burton*, "a historian's synthesis of various source materials that enables the jury to perceive patterns and trends can also

be 'helpful' within the meaning of Rule 702. Courts have recognized the helpfulness of expert historians testifying in these ways." 2018 WL 3954858, at *4.

For the above reasons, the Court denies the RTX Defendants' motion to exclude the opinion and testimony of Paul Sadin.

**B.**      **Dr. James T. Wells[5]**

The RTX Defendants argue that the Court should exclude the opinions of Plaintiffs' expert James T. Wells, Ph.D, P.G. because his methodologies and resulting opinions regarding (1) Plaintiffs' purported exposure to VOCs; (2) the alleged existence of imminent and substantial endangerment to human health and the environment; and (3) the effectiveness of RTX's remediation efforts to date are unreliable under Rule 702 and the principles outlined in *Daubert*. For the reasons outlined below, the Court denies the motion to exclude as to Dr. Wells.

**1.**      **Exposure Opinions**

The RTX Defendants first take issue with Dr. Wells's opinions regarding Plaintiffs' exposure to the contaminants.

**a.**      **Opinions Regarding Indoor Air Exposure**

With respect to Dr. Wells's opinion that Plaintiffs were exposed to toxic chemicals in their homes, the RTX Defendants argue that this opinion is contradicted by screening data and must therefore be excluded. The RTX Defendants present data provided by one of their experts, Thomas McHugh, Ph.D. ("Dr. McHugh"), to demonstrate that "VOCs have never been detected at the Powells' residence at concentrations above IDEM screening levels and that recent sampling at both homes reveals concentrations far below the applicable IDEM screening levels."  Wells Mem. at 5.

---

[5] The RTX Defendants filed their memorandum in support of excluding Dr. Wells ("Wells Mem.") at ECF No. 330. Plaintiffs filed their response at ECF No. 391 ("Resp. to Wells Mem."). The RTX Defendants filed their reply at ECF No. 402 ("Wells Reply"). Dr. Wells's report can be found at ECF No. 335-10 ("Wells Rpt."). Excerpts from Dr. Wells's deposition can be found at ECF No. 335-13 ("Wells Dep.").

They cite Dr. McHugh as interpreting this data to mean that there is no sewer preferential pathway vapor intrusion in either Plaintiff's home. *Id.* at 6-7. The RTX Defendants argue that, in disagreeing with Dr. McHugh and concluding that Plaintiffs may have been exposed in their homes, Dr. Wells ignores the sampling data and, for that reason, the Court must exclude his opinions. Wells Mem. at 7-8.

In response, Plaintiffs argue that the RTX Defendants take issue with Dr. Wells's conclusions, as opposed to his methodology—which is not grounds for exclusion. The Court agrees. The RTX Defendants appear to be arguing that Dr. Wells's conclusions do not comport with their expert's understanding of the underlying data. Dr. McHugh says the screening results rule out vapor intrusion into Plaintiffs' home; Dr. Wells disagrees. The Court will not weigh in at this time, as "[i]n a case of dueling experts, . . . it is left to the trier of fact . . . to decide how to weigh the competing expert testimony." *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 946 (7th Cir. 2019) (internal quotation marks omitted).

Further, as Plaintiffs point out, screening levels are not determinative of liability. *See Mod. Holdings, LLC v. Corning, Inc.*, 2018 WL 561857 (E.D. Ky. Jan. 25, 2018) (declining to exclude an expert's opinions where the level of contaminant did not reach or exceed the EPA's screening level because the plaintiffs were bringing claims where liability was not necessarily tied to EPA or state-imposed statutory cleanup standards); *Mod. Holdings, LLC v. Corning, Inc.*, 2022 WL 710174 (E.D. Ky. March 9, 2022) (same). Plaintiffs here bring common law claims for nuisance and negligence, as well as a claim for trespass—claims which are not tied to state or federal regulatory cleanup standards. Screening levels are similarly "not determinative" to liability in the context of Plaintiffs' RCRA claims. *Schmucker v. Johnson Controls,, Inc.*, 477 F. Supp.3d 791, 813-14 (N.D. Ind. 2020).

The RTX Defendants cite to a recent Northern District of Indiana opinion, *Schmucker v. Johnson Controls, Inc.*, in support of their argument that Dr. Wells's opinions should be excluded. Wells Mem. at 7-8 (citing 477 F. Supp. 3d at 823). In the context of Dr. Wells's indoor air exposure opinions, the RTX Defendants cite *Schmucker* for the proposition that an "expert cannot simply identify the most stringent screening level to demonstrate or establish a risk"—something they accuse Dr. Wells of doing. Wells Mem. at 7 (citing *Schmucker*, 477 F. Supp. 3d at 823). At first glance, there are significant similarities between the *Schmucker* case and the case at hand. In *Schmucker*, TCE and other chemicals were released into the ground at a manufacturing facility, which resulted in groundwater contamination. 477 F. Supp. 3d at 795. Plaintiffs filed claims under RCRA. *Id.* In the opinion cited by the RTX Defendants, the court rejected the plaintiffs' argument that exceedances of IDEM screening levels might present an endangerment for purposes of proving their RCRA endangerment claim, explaining that, "[b]ecause screening levels represent the lack of a risk, not the threshold for where a risk may occur, it is inappropriate to cherry-pick the most stringent levels and to suggest that they reflect the level at which an endangerment may occur." *Id.* at 824.

But the context of the *Schmucker* opinion distinguishes it from the question presented here. It was issued at a later stage in the litigation—following a bench trial on plaintiffs' RCRA endangerment claim. *Id.* Discovery and summary judgment deadlines had passed, and the Court was considering all evidence presented, including from conflicting expert reports. Additionally, by the time of the issuance of the relevant opinion in *Schmucker*, all that remained in the case was a RCRA endangerment claim. Here, Plaintiffs also bring common law claims. Further, the *Schmucker* court was concerned only with present and future contamination; this case is concerned with past contamination, as well. Finally, Dr. Wells's opinion does not only rely on screening

16

data—much less on "the most stringent screening level" to demonstrate a risk of contamination—but rather considers screening data in the context of other evidence. And when this Court is at the fact-finding stage, it will consider Dr. Wells's report in conjunction with the other expert reports and other discovery materials in order to determine whether Plaintiffs have demonstrated risk of endangerment. The *Schmucker* court speaks to what kind of evidence will make a claim at the ultimate proof point—not what evidence may be presented.

The Court declines to exclude Dr. Wells's opinion that Plaintiffs were exposed to toxic chemicals through indoor air in their homes.

### b. Opinions Regarding Exposure Through Drinking Water Wells and Surface Water

The RTX Defendants also take issue with Dr. Wells's opinion that Plaintiffs may have been exposed through the town's drinking water supply, which "has been contaminated for decades." Wells Mem. at 8-11. Specifically, the RTX Defendants object to a table Dr. Wells uses, labeled "VOC Contaminants in Town Drinking Water Wells," arguing that its title is misleading because the values in the table come from sampling of raw water—water which has yet to be treated by the air stripper or the Andrews water treatment facility process, two treatments that will occur before residents may drink the water. The court finds this unpersuasive.

The wells provide the town with drinking water, so referring to them as "drinking water wells" seems reasonable. To the extent that the RTX Defendants are concerned that the jury will not understand that the water is subsequently treated for contaminants, they should be able to clarify that easily at trial. The Court does not believe that this would be overly confusing for the jury. *See Daubert*, 509 U.S. at 596 (warning against being "overly pessimistic about the capabilities of the jury and of the adversary system generally"). Indeed, Dr. Wells does not dispute that the level of VOCs at issue in finished drinking water have never exceeded the Maximum Contaminant

Levels ("MCLs"), making this issue even more straightforward for cross-examination. Resp. to Wells Mem. at 13 (citing Wells Dep. at 85:1-8).

The RTX Defendants also object to the fact that the table contains only samples from Well 1 and omits data from Wells 2 and 3. Because the samples analyzed from Wells 2 and 3 have all been below the federal MCLs for the relevant contaminants, the RTX Defendants argue that the omission constitutes impermissible "cherry picking." Wells. Mem. at 8-9. But, as Plaintiffs explain in response, the table is intended to display the maximum and minimum concentration for each chemical at any of the three drinking water wells. *See* Resp. to Wells Mem. at 14; Wells Rpt. at 13. Because Wells 2 and 3 have lower concentrations of the relevant VOCs, it makes sense that samples from those wells are not represented in the "maximum concentration" column. The RTX Defendants provide a table created by their expert, Dr. McHugh, which illustrates that "all available test results for the finished drinking water samples . . . indicate no VOC detections at concentrations exceeding [MCLs]." Wells Mem. at 9. The different tables provided by the experts will be considered at the fact-finding stage of the case.

Finally, the RTX defendants attack Dr. Wells's drinking water opinions based on a ruling in *Asher v. Raytheon Technologies Corporation*, a case filed in state court that also brought claims related to groundwater contamination in Andrews, Indiana. In that case, the judge entered an order denying a motion for preliminary injunction filed by the town of Andrews and, in doing so, stated that the plaintiffs were "unlikely to succeed on the merits of their Complaint because, fundamentally, the drinking water is safe based on applicable Safe Drinking Water Act Standards, as confirmed by sampling conducted by the Town, Raytheon, and IDEM." Wells Mem. at 10 (citing *Asher, et al v. Raytheon Techs. Corp., et al.*, Cause No. 35D01-2006-CT-000338 (July 17, 2021)

18

(Findings of Fact, Conclusions of Law and order Denying Plaintiff's Verified Emergency Motion for Preliminary Injunction)).

The RTX Defendants do not argue that this finding is preclusive, and the Court does not find it to be a reason to exclude Dr. Wells's opinion about drinking water well contamination at this stage. Dr. Wells opines on contamination in the drinking water wells, while the *Asher* opinion addresses contamination of finished drinking water—as noted above, Wells does not dispute that the finished drinking water in Andrews is below the MCLs for the relevant VOCs. The experts can draw their own conclusions about drinking well water pre-treatment, which will then be subject to cross-examination.

The RTX defendants also object to Dr. Wells's conclusion that Plaintiffs have been exposed to contaminants through surface water at Loon Creek, arguing that it should be excluded because (1) Wells did not conduct any sampling at Loon Creek, and (2) there is no evidence that Plaintiffs were ever in the creek. The Court does not find either argument persuasive. First, Wells relies on sampling done by others—the RTX Defendants provide no authority for the proposition that an expert may only rely on sampling he does himself, and if they did, there would be plenty of contradicting case law. *See, e.g. Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999) ("[R]eview of experimental, statistical, or other scientific data generated by others in the field may suffice as a reasonable methodology upon which to base an opinion.") (internal quotation marks omitted); *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 743 (N.D. Ill. 2005) ("[T]he process of analyzing assembled data while using experience to interpret the data is not illicit; an expert need not actively conduct his or her own tests to have a valid methodology.")

Second, regarding surface contamination at Loon Creek, Dr. Wells states only that "[e]xposure pathways for anyone swimming, wading or fishing in the creek would have included

19

direct dermal contact, incidental ingestion, and inhalation of VOCs that volatized from the service water into the air." Wells Rpt. at 14. He does not conclude that Plaintiffs actually were exposed. Plaintiffs also clarify in their response brief that "exposures by these pathways—namely, surface water and Loon Creek—were not incorporated into Dr. Wells's exposure calculations and estimates." Resp. to Wells Mem. at 17-18 (citing Wells Rpt. at 14-20).

The Court declines exclude Dr. Wells's drinking water or surface water opinions.

### c.      Estimations of Indoor Air Exposure

The RTX Defendants ask the Court to exclude Dr. Wells's calculated estimations of VOC concentrations in indoor air for the Millman and Powell residences between 1968 and 2020, arguing that his methodology is "replete with issues." Wells Mem. at 11-16. In estimating indoor vapor concentrations arising from groundwater contamination, it appears to the Court that there is a basic, widely-accepted methodology: Experts first determine the extent of the groundwater contamination from sample well readings. They then use so-called "attenuation factors" that allow them to estimate indoor air concentrations based on groundwater concentrations. That is the methodology Dr. Wells followed—it is also the methodology followed by the RTX Defendants' expert, Dr. McHugh. Both Dr. Wells and Dr. McHugh used groundwater data from wells near Plaintiffs' homes to identify trends. *See* Wells Rpt. at 14-20, McHugh Rpt. at 35-42.

Rather than explaining how Dr. Wells failed to comply with this methodology, the RTX Defendants take issue with his data set and the assumptions he makes with respect to his determination of the extent of groundwater contamination. Wells Mem. at 12-13. The RTX Defendants also object to Dr. Wells's decision to calculate attenuation factors using measured VOC concentrations for samples collected in the basement and crawl spaces of Plaintiffs' homes. *Id.* at 14. They cite to their own experts in explaining why these choices are objectionable—and the court

is not going to pick a side now. *Schultz v. Akzo Nobel Paints*, *LLC,* 721 F.3d 426, 433 (7th Cir. 2013) ("Rule 702 [does] not require, or even permit, the district court to choose between [competing] studies at the gatekeeping stage.").

The RTX Defendants contend that the consequence of Dr. Wells's choices lead to an over-prediction of VOC concentrations in the indoor air of the Plaintiffs' residences. The Court concludes that these criticisms are not proper *Daubert* challenges. The Court agrees with Plaintiffs' characterization of the RTX Defendants' criticisms as a matter of "professional judgment." *See* Resp. to Wells Mem. at 19. In arguing for the exclusion of Wells's indoor air estimations, the RTX Defendants cite Dr. McHugh's report—a report they may present to the finder of fact, who will then consider the differences in expert opinions before reaching an ultimate conclusion. If the methodology used by Wells did lead to an over-prediction of VOC concentrations, that is a matter for cross-examination, not a basis to strike. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt.").

The Court declines to exclude Dr. Wells's estimations of indoor air exposure.

### d.    The RTX Defendants' Citations to Prior Opinions

The RTX Defendants argue that Dr. Wells's opinions are otherwise unreliable and should be excluded because (1) Dr. Wells's contamination opinion was excluded in *Asher*, and (2) "similarly flawed and speculative exposure estimates have been excluded in other cases." Wells Mem. at 16-19.

Regarding the first argument, the Court does not find that the *Asher* opinion counsels excluding Dr. Wells's opinions here. First, as noted earlier, the RTX Defendants fail to explain

what kind of preclusive or determinative effect the state case might have on the expert motions here. And second, the scope of that case—and the scope of Dr. Wells's opinions—was different. The *Asher* opinion the RTX Defendants cite was on a motion for preliminary injunction whose focus was on the potential for irreparable future harm. The opinion excluded in that case was intended only to support the plaintiffs' request for injunctive relief. Dr. Wells's opinions here are intended to support a much broader case, with statutory and common law claims encompassing past harms, as well as present and future. The *Asher* preliminary injunction also focused only on the drinking water supply, whereas here, exposure from other sources is at issue as well. While the Court may reconsider the relevance of the *Asher* opinion at a later stage, it will not now exclude Dr. Wells's opinion on that ground.

Regarding the second argument, that "speculative exposure estimates, like the one proposed by Wells, have been deemed inadmissible in other cases similar to this one," the RTX Defendants rely mainly on *Junk v. Terminix Int'l Co. P'ship*, a case from the Southern District of Iowa. 594 F. Supp. 2d 1062 (S.D. Iowa 2008).[6] Wells Mem. at 17-19. In *Junk*, the plaintiff's expert, Dr. Fenske, submitted testimony concluding that the plaintiff's exposure to a chemical pesticide resulted in her son's underlying health condition. In order to reach that conclusion, Dr. Fenske compared the circumstances of the plaintiff's exposure with the circumstances of participants' exposure in other studies to determine whether her exposure levels had exceeded the reference doses. In excluding Fenske's report, the court cited a lack of evidence "that Dr. Fenske's methodology ha[d] been tested, subjected to peer review or publication, ha[d] known or knowable

---

[6] The RTX Defendants cite two other cases to support their assertion that "similar flawed and speculative exposure estimates have been excluded in other cases": *Cummins v. Lyle Indus.*, 93 F.3d 362, 368-70 (7th Cir. 1996); *Varlen Corp. v. Liberty Mut. Ins.*, 924 F.3d 456, 458-60 (7th Cir. 2019). The RTX Defendants do not explain how the excluded testimony in those cases is similar to the testimony at issue here.

rate[s] of error, or [was] generally accepted in the scientific community." *Junk*, 594 F. Supp. 2d at 1071.

The RTX Defendants contend that Dr. Wells's report suffers from the same deficiencies. But the RTX Defendants fail to explain this accusation—it appears that the only way they connect Dr. Wells's report to the one at issue in *Junk* is by asserting that Dr. Wells's "is not based on reliable, documented facts, has not been widely tested, has not been subject to peer review, and is not generally accepted in the relevant scientific community, should not be deemed reliable and therefore admissible under Fed. R. Evid. 702." Wells Mem. at 19. The Court will not search the record for factual support for these conclusions where the RTX Defendants do not provide it. *See Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties.").

Further, Dr. Fenske's methodologies are easily distinguishable from those employed by Dr. Wells. Dr. Wells did compare the circumstances of exposure between Plaintiffs and other known studies. While the RTX Defendants may take issue with the data Dr. Wells uses or the conclusions he draws from that data, they cannot argue he used none.

### e.      Imminent and Substantial Endangerment Opinions

The RTX Defendants also move to exclude Dr. Wells's opinion that the release of VOCs from the former UTA facility created subsurface contamination "that presents an imminent and substantial endangerment to human health and the environment within the meaning of [RCRA]." Wells Mem. at 19 (citing Wells Rpt. at 20).

Their first argument is that Dr. Wells is generally unqualified to render the opinion. More specifically, the RTX Defendants characterize Dr. Wells's imminent and substantial endangerment opinion as "undoubtedly a medical opinion requiring medical expertise that Wells admits he does

23

not have." Wells Mem. at 20. The Court disagrees. To begin with, the Court assumes that this objection applies only to Dr. Wells's opinion on the effect of the contaminants on human health—it would beg disbelief that Dr. Wells would need medical expertise to opine on their effect on the environment.

But even so, the Court finds that Dr. Wells is qualified to make this opinion. The case cited by the RTX Defendants to support their argument that Dr. Wells is unqualified, *Wintz By and Through Wintz v. Northrop Corporation*, is distinguishable from the case at hand. 110 F.3d 508, 514 (7th Cir. 1997). In *Wintz By and Through Wintz*, the Seventh Circuit upheld a district court's exclusion of an expert toxicologist's opinion that a plaintiff's exposure to a chemical while pregnant caused the baby's abnormalities. The court held that, "notwithstanding his general qualification as a toxicologist, [the expert] did not possess sufficient expertise or knowledge as to the relevant medical question dealing with the proximate cause of [the baby's] injuries to assist the trier of fact in understanding the case." 110 F.3d 508, 514 (7th Cir. 1997). Dr. Wells's opinion is that the release of VOCs here "presents an imminent and substantial endangerment to human health"—not that Plaintiffs' specific injuries were caused by the release. Plaintiffs have other experts to speak to causation.

The RTX Defendants also return to *Schmucker*, citing it for its finding that contamination did not present an imminent and substantial endangerment to health where vapor mitigation systems ameliorated present or obviated the risk of future imminent harms. They argue that Dr. Wells's report suffers from the same flaw—that he "makes no effort to draw any connection between the contamination at the former UTA Facility and a serious health risk." Wells Mem. at 21. But the finding in *Schmucker* is not related to expert reports, but rather a court's ultimate finding after weighing all evidence, including conflicting expert testimony, and is therefore not

helpful here. And as stated above, Plaintiffs have other experts intended to demonstrate the causal nexus between the contamination and the injuries suffered by Plaintiffs.

The Court declines to exclude Dr. Wells's substantial endangerment opinions.

### f.        Remediation Opinions

The RTX Defendants argue that Dr. Wells's remediation opinions must be excluded as they "ignore critical information and are based on plainly incorrect premises." Wells Mem. at 20. First, the RTX Defendants take issue with Dr. Wells's statement in his remediation opinion that "[d]ual phase extraction was a low cost, highly inefficient remediation technology for a DNAPL site." Wells Mem. at 21-35 (citing Wells Rpt. at 8). They cite the report of one of their experts, Richard Lewis, in arguing that Dr. Wells is "simply wrong."

Second, The RTX Defendants contend that Dr. Wells "misrepresents the role the Andrews water treatment system plays in remediation," and "ignores the role that drinking water systems can play generally." Wells Mem. at 22. The Court agrees with the Plaintiffs that Dr. Wells does not ignore the role that drinking water systems can play, but rather disagrees with the RTX Defendants' experts regarding whether it is appropriate for drinking water systems to be used as part of remedial strategy at contaminated sites. *See* Resp. to Wells Mem. at 31.

Third, the RTX Defendants argue generally that Dr. Wells ignores key facts in reaching his conclusion that "current conditions at this site indicate an existing risk to health and the environment." Wells Mem. at 23 (citing Wells Rpt. at 21). Specifically, they point to sampling done during remediation that shows that "100% of the finished water samples collected from the Town of Andrews have met the MCLs established for the VOCs at issue." *Id.* at 24. They state that Dr. "Wells'[s] failure to consider literally decades of publicly available information showcasing mitigation measures that have been implemented and the corresponding clear absence of an

imminent or substantial endangerment renders his opinions unreliable." *Id.* at 25.[7] Plaintiffs counter this accusation with data demonstrating contamination of water in Well 1, in an Andrews resident's kitchen, and at the school in Andrews. Resp. to Wells Mem. at 32-33.

All these arguments suffer from the same flaw. As the Court has explained earlier in this opinion, disagreements over data inputs and correctness of conclusions are not reasons to strike expert testimony. *See Smith*, 215 F.3d at 718. The Court will not exclude an opinion on these grounds—the RTX Defendants are encouraged to present their experts and allow the fact finder to decide which conclusions are right and which are wrong. *See Moehrl v. Nat. Ass'n of Realtors*, 2023 WL 2683199, at *6 (N.D. Ill. Mar. 29, 2023).

The Court declines to exclude Dr. Wells's remediation opinions.

### g.    Danger of Prejudice

Finally, the RTX Defendants argue that Dr. Wells's testimony should be excluded because the potential dangers of his testimony outweigh any probative value. Wells Mem. at 25-26. The Court does not agree. The argument on this point is minimal—the RTX Defendants cite only the "significant inaccuracies in Wells'[s] exposure analysis and the fact that Plaintiffs' other experts heavily rely on that analysis[.]" Over the course of the RTX Defendants' motion, the Court has not identified any "significant inaccuracies" that would be appropriate to address now, as opposed to through cross-examination.

---

[7] For case support, they once again cite to *Schmucker*, this time for the court's statements that "screening levels do not reflect levels above which serious health effects may occur. Instead, they represent levels at which no effects are expected," and that "exceeding a regulatory screening level thus does not indicate a risk of an adverse health effect." Wells Mem. at 25 (quoting *Schmucker*, 477 F. Supp.3d at 823). Again, this is in the context of the weight a court gives evidence at the fact-finding stage—it is not relevant to the question of what evidence may be presented.

For the above reasons, the Court denies the RTX Defendants' motion to exclude the opinion and testimony of Dr. Wells.

### C.  Kathleen Gilbert, Ph.D, and Kenneth Spaeth, M.D.[8]

Plaintiffs engaged Dr. Gilbert and Dr. Spaeth (collectively, the "Causation Experts") to testify as to any causal nexus between Plaintiffs' alleged exposure to VOCs and their increased risks of adverse health effects.

Opal Millman is the only Plaintiff who has been diagnosed with an illness—trigeminal neuralgia, a facial pain syndrome associated with hyper-excitability of the trigeminal nerve that results in severe electric shock-like jolts of pain in the trigeminal nerve distribution. Defs. Statement of Facts at 11-12 (citing Third Am. Compl. ¶ 137). The Causation Experts both testify that her exposure to the contaminants at issue in this case contributed to Millman's developing trigeminal neuralgia. Spaeth Millman Rpt. at 29; Gilbert Rpt. at 26. With respect to the Powells, who have manifested no signs of illness, the Causation Experts testified as to an increased likelihood that they would experience adverse health effects in the future.

To prove toxic tort claims under Indiana law, Plaintiffs need to provide evidence of both general and specific causation. *See C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 831 (7th Cir. 2015) (citing *7-Eleven, Inc. v. Bowens*, 857 N.E.2d 382, 389 (Ind. Ct. App. 2006)). General causation examines whether the substance at issue "had *the capacity* to cause the harm alleged," while specific causation examines whether the substance "did, *in fact*, cause the harm alleged." *Id.*

---

[8] The RTX Defendants filed their memorandum in support of excluding Drs. Gilbert and Spaeth ("Gilbert & Spaeth Mem.") at ECF No. 331. Plaintiffs filed their response at ECF No. 388 ("Resp. to Gilbert & Spaeth Mem."). The RTX Defendants filed their reply at ECF No. 407 ("Gilbert & Spaeth Reply"). Dr. Gilbert's report can be found at ECF No. 335-21 ("Gilbert Rpt."). Dr. Spaeth's report as to Millman can be found at ECF No. 335-17 ("Spaeth Millman Rpt.") and his report as to the Powells can be found at ECF No. 335-20 ("Spaeth Powell Rpt.").

(internal quotation marks omitted) (emphasis in original). Both Causation Experts offer both general and specific causation opinions here.

The RTX Defendants argue that the Causation Experts' opinions should be excluded under *Daubert* because (1) they are not qualified to provide this testimony, (2) they "rely blindly" on calculations completed by Dr. Wells, which are "significantly flawed," (3) their reliance on regulatory screening levels for the relevant VOCs is impermissible, and (4) their methods and opinions are otherwise unsupported by the relevant scientific literature.

For the below reasons, the Court denies the motion to exclude with respect to Dr. Gilbert and Dr. Spaeth.

### 1. Qualifications

#### a. Dr. Gilbert

The RTX Defendants argue that Dr. Gilbert is not qualified to provide her opinion as to specific causation. Gilbert & Spaeth Mem. at 5-6. Their primary criticism is that Dr. Gilbert is not a medical doctor: "Any opinion that . . . the alleged exposure caused Plaintiffs[] to develop an increased risk of future adverse health effects or caused Millman to develop trigeminal neuralgia is undoubtedly a medical opinion requiring medical expertise that Gilbert does not have." Gilbert & Spaeth Mem. at 30. They emphasize her lack of experience examining, diagnosing, or treating patients for toxic exposure, trigeminal neuralgia, trigeminal neuropathy, cancer, or any other medical condition. *Id.*

The RTX Defendants are correct in stating that, under Indiana law, "[q]uestions of medical causation of a particular injury are questions of science necessarily dependent on the testimony of physicians and surgeons learned in such matters." Gilbert & Spaeth Mem. (quoting *Armstrong v. Cerestar USA, Inc.*, 775 N.E.2d 360, 366 (Ind. Ct. App. 2002)). But the question before us is

whether Dr. Gilbert may offer testimony under Federal Rule of Evidence 702, not whether her testimony will ultimately help the plaintiffs prevail on their claims. The RTX Defendants provide no on-point case law interpreting Federal Rule of Evidence 702, or *Daubert*, to support their contention that Dr. Gilbert's lack of a medical degree renders her unqualified to provide her causation opinion in this case. The case they do cite, *Wintz By and Through Wintz v. Northrop Corporation*, is easily distinguished. Gilbert & Spaeth Mem. at 31-32 (citing *Wintz*, 110 F.3d 508 (7th Cir. 1997)). The RTX Defendants argue that *Wintz* is relevant here because, in that case, the court found a toxicologist unqualified to render medical causation opinions: "The district judge also concluded that, . . . his testimony would not be helpful to the trier of fact, since [plaintiffs' toxicologist], who is neither a licensed physician nor a surgeon, lacked sufficient expertise in PWS, birth defects, or bromide exposure, to qualify him to offer an expert opinion as to the cause of [the child's] abnormalities." *Id.* (citing *Wintz*, 110 F.3d at 513).

But as Plaintiffs point out in response, the fact that the *Wintz* expert was not a medical doctor was not the primary reason for his exclusion. Rather, the court explained that not only was the expert not a medical doctor, but he also was not qualified to provide his toxicology opinions in the case—his qualification as a toxicologist "derived primarily from his master's degrees in chemistry and environmental engineering, and from his experience as a research chemist," and much of his experience as an expert witness was testimony regarding drunk driving. *Wintz*, 110 F.3d at 513. Further, his qualifications were only one part of the calculus in affirming his exclusion—the Seventh Circuit also criticized his methodology. *Id.* at 513-14.

Dr. Gilbert, unlike the expert in *Wintz*, is undoubtedly a qualified toxicologist, particularly with respect to TCE. As set forth in her report, Dr. Gilbert has "more than 35 years of experience as a scientist working in the area of immunology, with 25 years in the area of immunotoxicology

29

and human health risk toxicology." Gilbert Rpt. at 1. She received her Ph.D. in 1980 and has spent the intervening 45 years teaching immunology and toxicology at several universities, including the University of Arkansas at Little Rock and Colorado State University. *Id.* During those years, she was the Principal Investigator on four research studies into the effects of TCE and helped establish the Immunotoxicology Center at the Arkansas Biosciences Institute. *Id.* She has also published more than 80 peer-reviewed publications, nearly three-dozen regarding TCE and related toxicants. *Id.* She is the coeditor of a book titled *Trichloroethylene: Toxicity and Health Risks*—in which she authored the chapter titled "Trichloroethylene and Autoimmunity in Human and Animal Models" and coauthored the chapter entitled "Trichloroethylene and Cancer." *Id.*

In arguing that Dr. Gilbert is nonetheless unqualified to provide her specific causation opinion as to Opal Millman's diagnosis, the RTX Defendants note that she has never conducted research on trigeminal neuralgia or trigeminal neuropathy. *Id.* While that may be true, it seems to the Court to be too much to expect Plaintiffs to present a causation expert who is a medical doctor familiar with treating trigeminal neuralgia and who also has experience in the field of toxicology, specifically as regards to TCE.

The Court is satisfied that Dr. Gilbert is qualified to provide her specific causation opinions as to the connection between TCE and Opal Millman's trigeminal neuralgia diagnosis.

### b.    Dr. Spaeth

The RTX Defendants argue that Dr. Spaeth is not qualified to opine on the cause of trigeminal neuralgia. Gilbert & Spaeth Mem. at 34-35. Although Dr. Spaeth is a medical doctor, the RTX Defendants contend that he is nonetheless unqualified because he is not a neurologist or board-certified in toxicology and has not published any peer-reviewed literature relating to TCE, vinyl chloride, or benzene, or on trigeminal neuralgia, trigeminal neuropathy, an increased risk of cancer in humans exposed to TCE, VC, or benzene, or any purported link between TCE, VC, or benzene exposure and trigeminal neuralgia. *Id.*

In response, Plaintiffs emphasize Dr. Spaeth's medical degree as well as his master's degrees in public health and in occupational and environmental health. Resp. to Gilbert & Spaeth Mem. at 4-5. As set forth in his reports, Dr. Spaeth is board-certified in occupational and environmental medicine, and is currently the Chief of Occupational and Environmental Medicine and the Director of the Occupational and Environmental Medicine clinics at Northwell Health. *See* Spaeth Millman Rpt. at 3. As Assistant Professor at the Hofstra Northwell School of Medicine, where he holds the position of lead faculty for Environmental Health, Dr. Spaeth trains and teaches medical students, residents, fellows, and physicians how to "identif[y] and assess[] the clinical manifestations and management of toxic environmental exposures." *Id.* at 3.

Dr. Spaeth's resume belies the RTX Defendants' implication that he has insufficient experience with the toxic chemicals at issue in this case. In his report, Dr. Spaeth writes about his position as "the principal investigator on a [National Institute of Occupational Safety and Health]-funded grant examining the potential health effects of trichloroethylene exposure." Spaeth Millman Rpt. at 4. He also stated: "In my medical practice I have assessed, diagnosed and managed countless patients who have developed, or were at risk of developing, a wide range of adverse

31

effects from environmental and/or occupational exposure to industrial pollutants, asbestos, heavy metals, solvents and other hazards *including benzene, trichloroethylene and vinyl chloride.*" *Id.* (emphasis added).

The Court is satisfied that Dr. Spaeth is qualified to offer his opinions.

### 2.   Methodology

The RTX Defendants make numerous arguments that the Causation Experts' methods are unreliable such that their opinions should be excluded. The Court is unpersuaded by any of these arguments and declines to exclude either expert's opinion on the basis of methodology.

#### a.   Reliance on Dr. Wells's Calculations

The RTX Defendants' first argument is that the Causation Experts' general causation opinions should be excluded because they did not conduct their own exposure calculations for Millman and the Powells but rather relied exclusively on the estimations of VOC concentrations in the indoor air within Plaintiffs' homes as they were calculated by Dr. Wells. Gilbert & Spaeth Mem. at 7-10. Both Causation Experts have acknowledged their reliance on Dr. Wells's data. *See* Gilbert Dep. at 77:14-78:4; Spaeth Dep. at 92:2-21.

But the RTX Defendants provide no support for the proposition that causation experts must make their own exposure measurements and calculations, and there is plenty of case law indicating that experts may properly rely on the reports of other experts in forming their opinions. *See, e.g. Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000) ("Indeed, courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable."); *Wilbern v. Culver Franchising Sys.*, 2015 WL 5722825, at *14 (N.D. Ill. Sept. 29, 2025) ("[A]n expert cannot be an expert in all fields, and it is reasonable to expect that experts will rely on the opinion of experts in other fields as background material for arriving at an opinion.")

(internal quotation marks omitted). Rather, the RTX Defendants' argument seems to rest on their contention that Dr. Wells's "flawed calculations are unscientific, unreliable, and inconsistent with actual measured concentrations of VOCs in the groundwater and indoor air." Gilbert & Spaeth Mem. at 9.

This Court considered the RTX Defendants' criticism of Dr. Wells on the merits when it addressed their memorandum seeking the exclusion of his testimony. *See supra* Section III.B. Because the Court declined to exclude Dr. Wells's opinions, the Court will not exclude Dr. Gilbert's and Dr. Spaeth's opinions for their reliance on Dr. Wells's calculations.

### b.      Reliance on Regulatory Screening Levels

The RTX Defendants' second argument regarding methodology—that the Causation Experts impermissibly rely on regulatory screening levels to prove general causation—is the meat of their motion. *See* Gilbert & Spaeth Mem. at 10-22.

In arguing over whether the Causation Experts have appropriately considered regulatory screening levels in their causation opinions, both parties rely heavily on both the Northern District of Indiana's and the Seventh Circuit's opinions in *C.W. v. Textron, Inc.*, 2014 WL 1047940 (N.D. Ind. Mar. 17, 2014), *aff'd*, 807 F.3d 827 (7th Cir. 2015), as well as the Northern District of Indiana's opinion in *Hostetler v. Johnson Controls, Inc.*, 2020 WL 5543081 (N.D. Ind. Sept. 16, 2020). But while both parties agree that these cases hold important precedent for resolving the case at hand, they disagree as to how the opinions counsel the Court here.

*Textron* addressed expert testimony regarding whether alleged exposure to VC via groundwater contamination caused illness in two children as well as substantially increased their risk of future adverse health effects. 2014 WL 1047940, at *1. One of the plaintiffs' experts—Dr. Jill Ryer-Powder—opined that the plaintiffs had been exposed to vinyl chloride at levels sufficient

33

to cause harm, including a future increased risk of cancer. *Id.* at *2. In excluding her opinion, the court noted Dr. Ryer-Powder's reliance on regulatory standards, stating that consideration of regulatory standards "alone is an improper basis for an expert opinion, for mere exposure to toxins in excess of regulatory levels is insufficient to establish causation." *Id.* at *5 (citing *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 674-75 (7th Cir. 2009)). In affirming the District Court opinion, the Seventh Circuit emphasized the same point, explaining: "Dr. Ryer-Powder seeks a boost from government regulation. . . . But exceedance of government regulation, as we've held before, does not by itself prove causation." *Textron*, 807 F.3d at 838.

In *Hostetler*, the court cited *Textron* in excluding expert testimony—including from Dr. Gilbert and Dr. Spaeth—holding that "experts who seek to determine whether a particular individual faces an increased risk from a particular exposure must do more than merely compare an exposure to a regulatory value." 2020 WL 5543081, at *3.

That an expert cannot rely solely on exceedance of regulatory standards, therefore, is not in contention. And for good reason—as the District Court explained in *Textron*, "regulatory agencies are charged with protecting public health and thus reasonably employ a lower threshold of proof in promulgating their regulations than is used in tort cases." 2014 WL 1047940, at *5. However, the RTX Defendants overstate the principle, contending that "regulatory guidelines are not *probative* of medical causation," Gilbert & Spaeth Mem. at 10 (emphasis added). As the District Court explained in *Textron*, "[i]t may be the case that regulatory exceedances, in combination with other evidence, can be relied upon in forming causation opinions." 2014 WL 1047940, at *5. The issue is only when an expert's causation opinion is based *solely* on exceedance of regulatory standards that there becomes a problem. *Id.*

In *Hostetler*, the court stated that experts using regulatory values to assess individual risk would "have to reliably apply those levels to a particular individual's exposure in order to offer opinions about whether that individual faces an increased risk." 2020 WL 5543081, at *3. The experts in *Hostetler*—which included Dr. Gilbert and Dr. Spaeth—did not make these individualized calculations, and the Court explained that "[w]ithout having even considered the duration of any of the Plaintiffs' exposures, these experts were not comparing apples to apples in relying on the regulatory values." *Id.*

Here, the Causation Experts have considered exceedance of regulatory standards in the context of an individual dose and duration calculation for each plaintiff, rendering their citations to regulatory guidelines permissible. Dr. Gilbert calculated an exposure dose (an "ADD," or average daily dose) and duration for each plaintiff using the number of years each plaintiff was exposed to each chemical and the average exposure for that duration as calculated by Dr. Wells. Gilbert Rpt. at 21 (Millman); *Id.* at 26 (Eric Powell); *Id.* at 30 (Laury Powell). She then "compar[ed] the amount and duration of the plaintiffs' exposure doses to those documented in the literature to cause toxicity, and by comparing their exposure to federal guideline values above which the risk to human health is thought to be increased." *Id.* at 22; *see also id.* at 21-25 (Millman); *Id.* at 26-30 (Eric Powell); *Id.* at 30-31. In Table 1 of her report, for each Plaintiff and each VOC at issue, Dr. Gilbert includes a hazard quotient ("HQ") (based on a reference concentration of 2 µg/m3), ADD (based on a reference dose of 0.5 µg/kg/day), exceedance based on noncancer screening level of 2.1 µg/m3, and exceedance based on cancer screening levels of 0.48 µg/m3. *Id.* at 22. Dr. Spaeth also considered exceedances of regulatory levels in the context of the dose and durations calculated for each Plaintiff.

In reaching his conclusions, Dr. Spaeth calculated the Inhalation Cancer Risk for each plaintiff for each chemical, a calculation which takes into account exposure dose and duration. Spaeth Powell Rpt. at 17-21; Spaeth Millman Rpt. at 26-27. The Court is satisfied that the Causation Experts have appropriately used regulatory values in their reports, as they have considered them in the context of each Plaintiff's specific exposure dose and duration.

The RTX Defendants additionally critique the methods the Causation Experts used for their calculations. *See* Gilbert & Spaeth Mem. at 13-20. To begin with, they once again object to each Causation Expert's "blind[] rel[iance]" on Dr. Wells's exposure estimations which, as this Court explained above, is not grounds for exclusion at this point. They also argue that the regulatory values on which the Causation Experts rely presume a lifetime (70 years) of exposure. While Plaintiffs respond stating that the Causation Experts accounted for exposure commensurate with the years Plaintiffs resided in their homes, Resp. to Gilbert & Spaeth Mem. at 17, the RTX Defendants assert that this is unpersuasive because a 70-year presumption is included in the regulatory values themselves, a fact which Dr. Gilbert and Dr. Spaeth should have accounted for in their calculations and which they fail to acknowledge. Regarding Dr. Gilbert's calculations specifically, they object to the way she computes the durations used for her ADD calculations, as her calculations are based on the assumption that Ms. Millman and the Powells were at their residence 343 days a year for 13 hours a day for the entire length of time they resided in their houses, an assumption they dismiss as "simply speculation." Gilbert & Spaeth Reply at 4.

The Court finds that all these objections are appropriate for cross-examination at the fact-finding stage, and not for a *Daubert* motion. The Seventh Circuit generally has held that "[r]eliability . . . is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced."

*Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013); *see also Smith*, 215 F.3d at 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment.").

The Seventh Circuit recently brought *Manpower* and its separation of methodology from underlying data into question in a recent *Daubert* opinion, noting that the 2023 Amendments to Rule 702 altered the Rule's reliability subsection to clarify that "questions of the sufficiency of an expert's basis" go to admissibility just as with questions of "the application of the expert's methodology." *Gilbert v. Lands' End*, 2025 WL 2982190, at *5 n.3 (7th Cir. Oct. 23, 2025) (internal quotation marks omitted).  The note in *Gilbert* seems to imply that *Manpower*'s strict formulation of the standard—i.e., firmly distinguishing between reliable methodology and "the quality of an expert's data and conclusions"—may no longer be appropriate after the 2023 amendments. That said, just as the Seventh Circuit held in *Gilbert*, the conclusion in this case would be the same under either standard because Dr. Gilbert has demonstrated sufficient basis for her conclusions. The assumptions Dr. Gilbert made when making her calculations seem reasonable enough to the Court for those calculations to be admissible under *Daubert*. To the extent the RTX Defendants take issue with Dr. Gilbert's calculations, the Defendants are free to probe the issue during cross-examination and present the jury with the alleged shortfalls.

In a similar vein to their argument about regulatory guidelines being "not probative of medical causation," the RTX Defendants argue that the "risk assessments" conducted by the Causation Experts are "irrelevant to prove general or specific causation in a toxic tort case." Gilbert & Spaeth Mem. at 12. To support this argument, they rely on three out-of-circuit opinions. *Id.* at 12-13 (citing *Rhodes v. E.I. du Pont de Nemours and Co.*, 253 F.R.D. 365, 377 (S.D. W. Va. 2008);

*McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1249 (11th Cir. 2005); *Sutera v. Perrier Grp. Of Am., Inc.*, 986 F. Supp. 655 (D. Mass. 1997). They make too much of these opinions. The Court in *Rhodes* characterized risk assessments as "of limited utility in [] toxic tort case[s]," explaining that "[r]isk assessments have largely been developed for regulatory purposes and thus serve a protection function in providing a level below which there is no appreciable risk to the general population." *Rhodes*, 253 F.R.D. at 377. The Court in *McClain* similarly stated that agency risk assessments are "of marginal relevance to estimating 'causation' in an individual," as the toxicology approaches that goes into each are different. 401 F.3d at 1249. The *Sutera* court's discussion of reliance on risk assessments in the context of proving causation was similar.

The RTX Defendants' argument regarding risk assessments is unpersuasive for the same reason as the Court discussed above when addressing *Textron*—the fact that a regulatory screening level or risk assessment is insufficient on its own to establish causation does not make it meaningless. Where causation experts use risk assessments in conjunction with personalized exposure calculations for dose and duration for each plaintiff—as Dr. Gilbert and Dr. Spaeth do here—a court need not exclude their opinions.

The RTX Defendants also specifically object to the Causation Experts' use of the EPA's inhalation unit risk ("IUR"), an EPA-derived cancer-risk benchmark, and cancer risk evaluation guides ("CREGs"), which are developed by the Agency for Toxic Substances and Disease Registry ("ATSDR"). *See* Gilbert & Spaeth Mem. at 18-20. The RTX Defendants cite one of their experts, Dr. McHugh, as explaining that IUR values "are not appropriate for prediction of actual cancer occurrence or adverse health effects in individuals," as they are based on "theoretical estimates of risk." *Id.* at 18 (citing McHugh Rpt. at 57). They list the conservative assumptions the EPA made in developing its upper-bound IUR for TCE, arguing that "[e]ach one of these conservative

38

assumptions serves to intentionally over-estimate the cancer risk, and, therefore, the resulting regulatory screening levels cannot be used to evaluate an individual cancer risk or specific causation." *Id*. at 19. They assert that the same is true for the IURs for VC and for benzene. *Id.* They also argue that Dr. Spaeth incorrectly uses the CREGs, citing the ATDSR as stating that, as the CREGS "are based on theoretical estimates of cancer risk," they "should . . . serve only as a screening tool and not as an indication that cancer is expected or predicted" and arguing that Dr. Spaeth impermissibly uses them as an indication that cancer is expected or predicted. Gilbert & Spaeth Mem. at 20 (citing ATSDR (2005)). However, the RTX Defendants provide no case law to support their argument that an expert may not consider IURs and CREGs when creating their report. They cite the Court in *Hostetler* as stating:

> [T]he only evidence [Dr. Gilbert's] report discusses for comparing these Plaintiffs' exposures to a level at which a risk occurs is regulatory levels, like the Reference Concentration and Inhalation Unit Risk. As already discussed, those levels do not present a reliable basis for identifying an increased risk in a particular individual . . . [Dr. Spaeth] discusses various evidence that TCE and PCE are carcinogenic and can have other toxic effects. But to conclude that these Plaintiffs are at risk of suffering those effects, all he does is note various regulatory levels and then the sampling data and Dr. Keramida's estimates about the indoor air concentrations in the Plaintiffs' homes. Like the other experts, he does not consider the duration of any of the Plaintiffs' exposures so as to compare them to the regulatory levels, either….

Gilbert & Spaeth Mem. at 21 (citing *Hostetler*, 2020 WL 5543081, at *6-7). But, as stated above, the Court is satisfied that Dr. Gilbert and Dr. Spaeth *do* compare regulatory levels to specific exposure levels calculated for each Plaintiff, distinguishing their reports in this case from the reports addressed by the *Hostetler* opinion.

While the conservative assumptions with which agencies have created these screening levels may be important to consider when weighing the persuasiveness of each expert's testimony at the fact-finding stage, the Court is not persuaded that it must exclude the Causation Experts'

opinions on these grounds. The RTX Defendants cite Dr. McHugh frequently in this section of their brief—the Court will not pick a side at this juncture. *Wipf v. Kowalski,* 519 F.3d 380, 385 (7th Cir. 2008). ([I]n a case of dueling experts . . . it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony.").

Finally, the RTX Defendants take issue with the Causation Experts' failure to make comparisons to Indiana Department of Environmental Management ("IDEM") standards, "despite the standards' obvious applicability in this case, given IDEM's regulatory oversight over the former UTA site." Gilbert & Spaeth Mem. at 20. But the RTX Defendants provide no case law indicating that an expert must consider every relevant set of standards in order for that expert's opinions to be admissible. And considering the RTX Defendants' position that Plaintiffs should not be relying on regulatory standards in forming their opinions, it is surprising that they would now criticize them for failing to rely on this particular set of standards.

The Court is satisfied that the Causation Experts do not run afoul of the Seventh Circuit's direction that "exceedance of government regulation . . . does not by itself prove causation." *Textron*, 807 F.3d at 838. The specific criticisms the RTX Defendants levy at the way in which the Causation Experts have used regulatory guidelines and risk assessments, and at the calculations and estimates they have made, may be addressed at the fact-finding stage of the case.

### c. Literature

The RTX Defendants also take issue with the literature the Causation Experts rely on in forming their general causation opinions. *See* Gilbert & Spaeth Mem. at 22-30. They note that neither causation expert cited a published, peer-reviewed study showing a causal nexus between exposure to the VOCs at issue and trigeminal neuralgia—but also note that that is because none exist. As Plaintiffs explain in response, experts are not required to cite published, peer-reviewed

40

studies demonstrating causal links to offer a causation opinion. *See* Resp. to Gilbert & Spaeth Mem. at 22 (citing *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1228 (9th Cir. 2017); *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 24 (1st Cir. 2011)).

### i.     Extrapolation

The RTX Defendants also criticize the studies the Causation Experts *do* cite, arguing that the Causation Experts run afoul of *Textron* and *Hostetler* for a second reason: they have not successfully extrapolated from literature examining exposure conditions and medical outcomes not at issue in the case. Gilbert & Spaeth Reply at 7. In *Textron*, in excluding Dr. Ryer-Power, the district court not only cited her inappropriate reliance on regulatory screening levels, but also found that "the analytical gap between the studies that [she] cite[d] and the facts of [the] case [was] just too great" to be admissible under *Daubert*. 2014 WL 1047940, at *11. The court made it clear, however, that it is not the case that an expert must be able to cite to a "study at the precise dose and duration" at issue in the case for his or her conclusions to be admissible—"experts can and frequently apply the results of similar studies to new cases and extrapolate the results." *Id.* at *14.

The RTX Defendants assert that the Causation Experts have relied on studies involving occupational, rather than residential exposure, without appropriate extrapolation. Gilbert & Spaeth Mem. at 28. They cite two of their experts, Dr. James McCluskey and Dr. Mark Roberts, in explaining that "relying on studies conducted in occupational settings is not appropriate in this case because higher exposures are generally expected in occupational study participants due to tasks involving the direct use of TCE, VC, or benzene in the workplace." *Id.*

The Court finds that neither of the Causation Experts' reports suffers from the kind of "analytical gap" that doomed the expert reports in *Textron*, and declines to exclude them on that basis. To identify whether such a gap exists, "[t]he critical inquiry is whether there is a connection

between the data employed and the opinion offered; it is the opinion connected to existing data only by the *ipse dixit* of the expert that is properly excluded under Rule 702." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) (internal quotation marks omitted).

Dr. Gilbert does discuss occupational and animal studies in the general causation section of her report. *See* Gilbert Rpt. at 9-17. But where she cites such studies, she notes that they were conducted in occupational settings or on animals, and the conclusions she draws from them are limited. For example, as support for her opinion that exposure to TCE can have adverse effects on human health, she cites the EPA's Final Risk Evaluation of TCE, published in 2020, which, as she explains, "led the Agency to confirm that TCE exposure can promote cancer, liver toxicity, kidney toxicity, neurotoxicity, immunotoxicity, reproductive toxicity, and developmental toxicity." Gilbert Rpt. at 10. Dr. Gilbert makes a point of noting that the evaluation "did not evaluate the risk to the general public from environmental TCE exposure," and was instead focused on risk from occupational exposure. *Id.* However, she notes that the Agency did find unreasonable risks to human health to workers nearby but not in direct contact to TCE, as well as to workers who were wearing PPE. *Id.* The conclusion she presents from the study is that the EPA "is extremely concerned about TCE toxicity, even at levels encountered by workers using PPE, or by bystanders of consumer use." *Id.*

Dr. Gilbert also cites her own work studying the effects of TCE exposure on mice in her general causation section, as "support[ing] the conclusion that TCE causes immunotoxicity, particularly autoimmune disease." *Id*. at 13. She cites the conclusion of the study as "confirm[ation] that mice exposed to occupationally acceptable levels of TCE develop autoimmune diseases tissue pathology and autoantibodies similar to those found in humans." *Id.* She explained that occupational rather than environmental exposure levels were chosen for the

initial mice studies "since these were focused on testing proof of concept (e.g., that TCE promoted autoimmunity), and therefore used a dose that might be expected to induce a statistically significant response in the relatively small number of mice." *Id.* The Court is satisfied that Dr. Gilbert has appropriately connected the occupational and animal studies she uses to her conclusions about the potential effects of TCE exposure.

In his report on Opal Millman, in the section labeled "TCE exposure and neurotoxicity," Dr. Spaeth acknowledges that "[m]ost studies conducted of exposure-related effects of TCE were of high-level exposures," but notes EPA's "extrapolation techniques in deriving protective benchmarks for exposure" as evidence that these studies are nonetheless "meaningful and inform understanding of lower-level exposures." Spaeth Millman Rpt. at 18. Dr. Spaeth cites animal studies in the context of the EPA's statement that "[l]aboratory animal studies provide limited additional support" for its "conclusion that TCE exposure induces trigeminal nerve impairment in humans." Spaeth Millman Rpt. at 19.

The Causation Experts explained that they had to rely on occupational and animal studies in forming their general causation opinions, as human environmental studies are not available. As the experts note, these are the same studies used by the EPA when it creates its risk assessments and establishes regulatory screening levels. The Court finds that the Causation Experts have handled these studies appropriately, explaining the limitations of each and drawing conclusions tailored to those limitations.

### ii.    Camp Lejeune

Separately, the RTX Defendants argue that Dr. Gilbert's citation in her specific causation opinion to a study conducted among military personnel stationed at Camp Lejeune between 1975 and 1985 is "irrelevant and unreliable." Gilbert & Spaeth Mem. at 28-30. The water at the Camp was contaminated with toxicants including benzene, perchloroethylene, vinyl chloride and, "most abundant[ly]," TCE. Gilbert Rpt. at 27. After an investigation into the contamination, the United States Department of Veterans Affairs stated that a 30-day continuous exposure to the contaminated water might qualify veterans and their family members for health benefits, if they were to suffer from one of fifteen different non-cancer and cancer diseases. *Id*. In her report, Dr. Gilbert states: "The fiscal responsibility assumed by the VA is based on the assumption that even a relatively brief exposure to the TCE-contamination at Camp Lejeune increased the risk of contracting these diseases. The increased incidence of the diseases noted by the VA were determined by evaluating the long-term health status of a relatively large data base." *Id.*

The RTX Defendants note that Dr. Gilbert's testimony regarding Camp Lejeune was excluded by the court in *Hostetler*, and argue that the same should be done here. Gilbert & Spaeth Mem. at 29-30 (citing 2020 WL 5543081, at *5). In *Hostetler*, the court stated:

> First, though, the Plaintiffs offer no reason to believe that a legislative decision to grant health benefits to veterans and their families is the type of evidence a toxicologist would rely on in reaching conclusions about causation. And second, they have not shown that Dr. Gilbert reliably extrapolated from those circumstances to any risks that may be posed here. The Camp Lejeune contamination involved multiple different contaminants in the drinking water, whereas Dr. Gilbert's opinion here addresses the effect of TCE in indoor air. Dr. Gilbert's report offers no explanation to bridge the gap from the types and amounts of exposures there to the exposures here.

2020 WL 5543081, at *5. In response, the Plaintiffs argue that the circumstances in this case are more similar to the Camp Lejeune example than were the circumstances in *Hostetler*. Resp. to

44

Gilbert and Spaeth Mem. at 25-26. To begin with, the only chemical at issue in *Hostetler* was TCE. In this case, TCE, VC, and benzene are all present, which are three of the five chemicals that were present at Camp Lejeune. *Id.* Additionally, in *Hostetler*, Dr. Gilbert had not provided any exposure dose calculations with which to compare the exposure in Camp Lejeune. In this case, as explained above, she has calculated exposure dose and duration for each plaintiff.

The Court agrees with the Plaintiffs that there is enough connecting the Camp Lejeune study to the situation at hand to distinguish the *Hostetler* opinion and for Dr. Gilbert's reference to it to be admissible. To the extent the RTX Defendants still believe the Camp Lejeune study is inapposite, they may expose the differences they see between this situation and that one during cross-examination.

### iii.    Other Objections to the Causation Experts' Cited Literature

The RTX Defendants have numerous additional issues with the literature cited by the Causation Experts. For example, they note that Dr. Gilbert cites nineteen studies to support her opinions in this case, but only four of them mention trigeminal neuralgia. Gilbert & Spaeth Mem. at 24-25. And the four studies mentioning trigeminal neuralgia, argue the RTX Defendants, mention trigeminal neuralgia in the context of TCE being a treatment, as opposed to a cause, of trigeminal neuralgia. Gilbert & Spaeth Reply. at 9. They state: "[I]t is important to recognize that Gilbert stands alone in her views that non-occupational exposure to trichloroethylene and/or vinyl chloride can trigger trigeminal neuralgia through an undefined pathway." Gilbert & Spaeth Mem. at 25-26. They make similar objections regarding Spaeth's use of literature, noting that, out of Spaeth's 40 references, "only 10 mention TCE in the context of trigeminal neuralgia, and nine out of these 10 discuss TCE as a *treatment* of trigeminal neuralgia, not the cause of the condition." Gilbert & Spaeth Mem. at 26.

The Plaintiffs have many arguments in response. The Court will not address the merits of these arguments, as these debates are not appropriate for a *Daubert* motion. Rather, resolution of the disagreement between Plaintiffs' experts and the RTX Defendants' experts over the quality of the literature cited in the Causation Experts' reports is a job for the jury. *See Schultz,* 721 F.3d at 433 ("Rule 702 [does] not require, or even permit, the district court to choose between [competing] studies at the gatekeeping stage.").

Also in their section on the Causation Experts' literature, The RTX Defendants accuse Dr. Spaeth of conflating trigeminal neuralgia with neuropathy and other unrelated diseases. Gilbert & Spaeth Mem. at 27-28. In response, Plaintiffs argue that there is a connection between trigeminal neuralgia and trigeminal neuropathy such that conversations about one are relevant to the other. Resp. to Gilbert & Spaeth Mem. at 25. This debate is one that will need to be resolved by the fact-finder, not by the Court at this juncture.

### d.    Dr. Spaeth's Specific Causation Methodology

The RTX Defendants have a few additional criticisms of the methodology Dr. Spaeth employed to form his specific causation conclusions. First, they object to what they characterize as Dr. Spaeth's improper assumption that the drinking water in Andrews is contaminated above MCLs. Gilbert & Spaeth Mem. at 35-37. They assert that, since 1994, all finished water samples taken by RTX's environmental consulting firm have been at or below the MCLs specified in the Federal Safe Drinking Water Act and adopted by IDEM. As additional support, they cite the preliminary injunction  ruling in *Asher v. Raytheon Technologies Corp.*, in which the court determined that the plaintiffs were "unlikely to succeed on the merits of their Complaint because, fundamentally, the drinking water is safe based on applicable Safe Drinking Water Act Standards, as confirmed by sampling conducted by the Town, Raytheon, and IDEM." Gilbert & Spaeth Mem.

at 37 (citing *Asher, et al v. Raytheon Techs. Corp., et al.*, Cause No. 35D01-2006-CT-000338 (July 17, 2021) (Findings of Fact, Conclusions of Law and order Denying Plaintiff's Verified Emergency Motion for Preliminary Injunction)). But as the Court explained in its section declining to exclude the opinions of Dr. Wells, the *Asher* opinion is easily distinguishable from the situation now before the Court. *See Supra* Section III.B.1.b.

In response, Plaintiffs note that nowhere in his report does Dr. Spaeth state that the contamination in the drinking water in Andrews exceeds the relevant MCLs. Resp. to Gilbert & Spaeth Mem. at 35-36. They continue: "Nor is an MCL exceedance necessary for the exposure to contaminants in the drinking water to be relevant and admissible information." *Id.* at 35. The Court agrees with Plaintiffs that contamination in drinking water could be relevant even if the contamination level does not exceed MCLs. The RTX Defendants argue in reply that "Spaeth's reliance on the inaccurate assumption that the Andrews drinking water is contaminated at dangerous levels (when it is not) presents further reliability issues with his opinions which would lead to juror confusion." Gilbert & Spaeth Reply at 14. The Court is unconvinced by this argument—all parties agree that the drinking water is not contaminated above MCLs, a fact the RTX Defendants will be able to clarify to the jury at trial. Whether the water is nonetheless contaminated, and the relevance of that contamination, may also be clarified at trial.

The RTX Defendants also contend that Dr. Spaeth's differential etiology is flawed. "A differential etiology is a process-of-elimination approach to determining a subject's cause of injury. Under this method, an expert considers all relevant potential causes of the symptoms and then eliminates alternative causes." *Textron*, 807 F.3d at 832 n.4 (internal quotation marks omitted). The RTX Defendants argue that the "most significant flaw in Spaeth's methodology is his failure to properly consider plausible, alternative causes for Millman's trigeminal neuralgia, or even

alternative causes for Millman and the Powells' 'heightened health risk.'" Gilbert & Spaeth Mem. at 37-38. In his report, Dr. Spaeth concludes that "it is more likely than not that [Opal Millman's] exposure to trichloroethylene is a significant contributing factor in her trigeminal neuralgia," noting "no clinical basis to otherwise adequately explain her developing trigeminal neuralgia." Spaeth Millman Rpt. at 28. The RTX Defendants specifically object to Dr. Spaeth's failure to mention Millman's hypertension and his failure to consider alternative exposures to VOCs through sources such as consumer products, first and secondhand smoke, potential workplace exposures, and through "various hobbies." *Id.* at 39.

Dr. Spaeth notes Millman's hypertension in his expert report. Spaeth Millman Rpt. at 20. As he explained in his deposition, Dr. Spaeth does not believe that hypertension is a risk factor for trigeminal neuralgia, and for that reason, and because hypertension is a very common diagnosis, he did not include it as a risk factor in his report. Resp. to Gilbert & Spaeth Mem. at 39; Spaeth Dep. Tr. at 143:17-144:8. If the RTX Defendants believe Dr. Spaeth should have more seriously considered Millman's hypertension diagnosis as a risk factor for her trigeminal neuralgia, they may present their own evidence to that effect, and may cross-examine Dr. Spaeth on the subject at trial.

Regarding Dr. Spaeth's failure to consider exposures to these VOCs through sources such as consumer products, first and secondhand smoke, potential workplace exposures, and through "various hobbies," the Court does not find this to be a persuasive argument for the exclusion of his specific causation opinion. To begin with, Dr. Spaeth did rule out the possibility of workplace exposures. *See* Spaeth Millman Rpt. at 24. And regarding the others potential exposures, the Court is satisfied that Dr. Spaeth's statement that "[t]here is no evidence to suggest Mrs. Millman experienced significant exposure to other toxic environmental or community exposures" is

48

adequate. *Id.* The RTX Defendants may cross-examine him as to the investigation and assumptions that led him to reach that conclusion at trial.

### e. Dr. Gilbert Specific Causation Methodology

As explained above, the Court does not agree with the RTX Defendants' argument that Dr. Gilbert is unqualified to provide a specific causation opinion. The RTX Defendants also make a more specific argument—that Dr. Gilbert lacks the requisite qualifications to conduct a differential etiology relating to Millman's trigeminal neuralgia. Gilbert & Spaeth Mem. at 32-34.

An expert conducting a differential etiology first "rules in all the potential causes of a patient's ailment and then [] systematically rule[es] out causes that would not apply to the patient[.]" *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). In her report, Dr. Gilbert "rules in" exposure to the contaminants at issue in the case as a cause of Millman's trigeminal neuralgia. *See* Gilbert Rpt. at 21-26. However, she does not appear to "rule in all the potential causes" of trigeminal neuralgia or "systematically rule out" the causes that do not apply to Millman. Indeed, she confirms that she did not do so in her deposition. Gilbert & Spaeth Mem. at 32-33 (citing Gilbert Dep. at 17:11-13; 23:7-14; 23:17-22; 26:16-20, 27:8-28:3, 72:12-16).

In support of admitting Dr. Gilberts' specific causation opinion, Plaintiffs cite an opinion from the Eighth Circuit, *Kirk v. Schaeffler Group*, in which the court upheld a district court's decision not to exclude Dr. Gilbert's causation testimony where defendants had argued that Dr. Gilbert had failed to systematically rule out alternative causes of the plaintiff's disease (in that case, autoimmune hepatitis, or "AIH"). *See* 887 F.3d 376, 390-93 (8th Cir. 2018). The defendants in that case specifically objected to Dr. Gilbert's testimony that:

> [W]here a young woman in a very small community is living over a Superfund Site
> that is contaminated with TCE, and the chances of anybody in that small group
> getting [AIH], which is a rare disease, is very small.

49

So, to me, that seemed pretty much like a no-brainer.

*Id.* at 391-92. That court explained that, in the Eight Circuit, "experts are not required to rule out all possible causes when performing the differential etiology analysis"—rather, "such considerations go to the weight to be given the testimony by the factfinder, not its admissibility." *Id.* at 392 (internal quotation marks omitted).[9] The court held Dr. Gilbert's opinion to be admissible.

The RTX Defendants point instead to *Hostetler*, in which the court addressed *Kirk*'s opinion as to Dr. Gilbert and her differential etiology. *See* 2020 WL 5543081, at *6. In dismissing *Kirk*'s importance to the *Hostetler* case, the court emphasized the difference in context:

> In *Kirk*, the plaintiff developed a rare auto-immune disease after living in an area heavily contaminated with TCE. Dr. Gilbert opined that TCE was capable of causing that disease, and she conducted a differential etiology and offered a specific causation opinion that the contamination caused that disease. But here, Dr. Gilbert did not conduct a differential etiology and is not offering a specific causation opinion, nor have any of the Plaintiffs manifested any disease.

*Id.* (citations omitted).

Though neither case is binding on this Court, both may be persuasive. In comparing the two, the Court finds that this case is more similar to *Kirk* than it is to *Hostetler*. Like the plaintiff in *Kirk*, Millman manifested a rare disease after living in an area with alleged TCE contamination, and Dr. Gilbert was retained to provide a specific causation opinion. While she has not conducted a robust differential etiology by any measure, the Court finds that Dr. Gilbert's causation methodology and opinion are nonetheless admissible. In her report, Dr. Gilbert provides detailed calculations explaining the levels of contaminants Millman was exposed to. Gilbert Rpt. at 19-25. She explains how rare trigeminal neuralgia is, and offers "strong evidence" that, in addition to

---

[9] This is true in the Seventh Circuit, as well. *See Schultz*, 721 F.3d at 434 (7th Cir. 2013).

genetic predisposition, "there has to be an additional environmental perturbation to trigger the disease." *Id.* at 25-26. The Court finds that the methodology Dr. Gilbert employed to reach her specific causation opinions is sufficient to satisfy the *Daubert* standard.

 **f.**  **Jack Millman**

Finally, the RTX Defendants object to both Causation Experts' reliance on information regarding Jack Millman, Opal Millman's deceased husband, who was allegedly diagnosed with trigeminal neuralgia before his death. Both Causation Experts note Jack Millman's diagnosis in their opinions. Dr. Spaeth stated: "For both [Opal Millman] and her husband, Jack Millman, to have both developed trigeminal neuralgia is an exceedingly unlikely occurrence unless there is a shared risk factor." Spaeth Millman Rpt. at 28. Stating that Opal and Jack Millman's sole common risk factor related to TCE was their exposure to TCE, he considers the fact that they both have a trigeminal neuralgia diagnosis to be "further support of an environmental trigger from TCE." *Id.* at 29. Gilbert wrote that her conclusion that "exposure to TCE, benzene and vinyl chloride had adverse health effect on Opal Millman and promoted the generation of trigeminal neuralgia" was "reinforced by the fact . . . that Millman's now-deceased husband Jack who also lived in the residence for many years was also diagnosed with this same rare disease." Gilbert Rpt. at 26.

The RTX Defendants contend that any opinions regarding Jack Millman are "wholly unsupported and unreliable" and should therefore be excluded. *See* Gilbert & Spaeth Mem. at 40-54. While they concede that Plaintiffs have produced some medical records for Jack Millman—a brain MRI, a billing sheet identifying the patient and noting a diagnosis of trigeminal neuralgia, and a death certificate—the RTX Defendants note that these documents were not in the possession of the Causation Experts at the time they wrote their reports. *Id.* at 42-43. They argue that there are no records to explain how or when the diagnosis occurred, or what risk factors Jack Millman

may have had. *Id.* For these reasons, they characterize any conclusions drawn using information about Jack Millman are "unsubstantiated ipse dixit." *Id.* at 45.

Plaintiffs respond by asserting that Dr. Spaeth relied not only on reports from Opal Millman and her daughter, but also on notes made by Dr. Lane, the treating physician of both Jack and Opal Millman. Resp. to Gilbert & Spaeth Mem. at 41-42. Dr. Lane made note of Jack Millman's trigeminal neuralgia diagnosis in two of Opal Millman's medical documents, stating twice: "Her husband also had trigeminal neuralgia." *Id.* (citing Ex. 18, Dep. Ex. 278; Ex. 19, Dep. Ex. 279). Plaintiffs also note documentation of a referral for an MRI Dr. Lane wrote for Jack Millman in 2014, in which "Trigeminal Neuralgia" was noted in the box labeled "DIAGNOSIS." Resp. to Gilbert & Spaeth Mem. at 42.

Further, Plaintiffs note that the Seventh Circuit has observed that "[m]edical professionals reasonably may be expected to rely on self-reported patient histories." *Walker*, 208 F.3d at 586. The court continued: "In situations in which a medical expert has relied upon a patient's self-reported history and that history is found to be inaccurate, district courts usually should allow those inaccuracies in that history to be explored through cross-examination." *Id.* It is true that this is not exactly the situation here, as Jack Millman is not available to report on his medical history and so the Court must consider the reports of Opal Millman and her daughter instead. But the reasoning holds true. Especially considering the presence of some medical records to corroborate the information provided by Opal Millman and her daughter, the Court finds that Jack Millman's trigeminal neuralgia diagnosis is admissible. Regarding the RTX Defendants' argument that the documentation regarding Jack Millman's diagnosis is vague and incomplete, this goes to the weight of the Causation Experts' testimony, not its admissibility, and is something they may explore during cross-examination at trial.

The RTX Defendants also criticize Dr. Spaeth for failing to conduct a differential etiology for Jack Millman before linking Jack Millman's trigeminal neuralgia diagnosis to his exposure to TCE in his home. Gilbert & Spaeth Mem. at 48-49. Plaintiffs argue in response that Dr. Spaeth does not need to conduct a differential etiology for Jack Millman, as he is not providing a specific causation opinion as to Jack Millman. Resp. to Gilbert & Spaeth Mem. at 45. The Court agrees with Plaintiffs, but cautions that Dr. Spaeth therefore may not testify as to the cause of Jack Millman's trigeminal neuralgia diagnosis. However, he may consider the fact of the diagnosis in forming his conclusions regarding Opal Millman.

Regarding Dr. Gilbert's consideration of Jack Millman's diagnosis, the RTX Defendants argue that she was not entitled to rely on Dr. Spaeth's statements regarding Jack Millman's trigeminal neuralgia. Gilbert & Spaeth Mem. at 51-53. Because the Court declines to exclude Dr. Spaeth's testimony regarding Jack Millman, it will not exclude Dr. Gilbert's opinion relying on such testimony.

The Court denies the motion to exclude with respect to Dr. Gilbert and Dr. Spaeth.

### D. Dr. Zachary Torry[10]

Dr. Zachary Torry, M.D., was retained to opine as to the causation and reasonableness of Millman's and the Powells' emotional distress.

The RTX Defendants do not argue that Dr. Torry lacks the qualifications to provide his opinions. A brief review of Dr. Torry's qualifications—which include a medical degree, a four-year residency in psychiatry, and a fellowship in forensic psychiatry and psychiatry and the law—

---

[10] The RTX Defendants filed their memorandum in support of excluding Dr. Torry ("Torry Mem.") at ECF No. 332. Plaintiffs filed their response at ECF No. 385 ("Resp. to Torry Mem."). The RTX Defendants filed their reply at ECF No. 401 ("Torry Reply"). Dr. Torry's report as to Millman can be found at ECF No. 336-8 ("Torry Millman Rpt."). His report as to the Powells can be found at ECF No. 336-9 ("Torry Powell Rpt."). Dr. Torry's Deposition can be found at ECF No. 336-10 ("Torry Dep."), and his C.V. can be found at ECF No. 385-2.

satisfies the Court that he is qualified. *See* Torry C.V. Rather, the RTX Defendants challenge the reliability of Dr. Torry's methodology and the relevance of his opinions.

### 1. General Arguments

#### a. Indiana's Modified Impact Rule

In what appears to be a relevance argument, the RTX Defendants first argue that Torry's opinions must be excluded because Plaintiffs have failed to satisfy Indiana's "modified impact" rule and therefore may not recover damages for their claims of negligent infliction of emotional distress. Torry Mem. at 4-6. Indiana's modified impact rule allows plaintiffs to recover damages for emotional trauma only in situations in which "'a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person.'" *Hostetler*, 2021 WL 5087261, at \*15 (quoting *Shuamber v. Henderson*, 579 N.E.2d 452, 456 (Ind. 1991)). The RTX Defendants take the opportunity to criticize Plaintiffs' case, stating that "there is no expert testimony—or any other evidence" to satisfy this standard in the context of any of the Plaintiffs.

This argument, which criticizes the Plaintiffs' case rather than the expert testimony of Dr. Torry, is appropriate for summary judgment or trial, rather than this *Daubert* motion. The RTX Defendants attempt to get around this by arguing that, because Plaintiffs cannot show direct impact, the court need not evaluate the reasonableness of Plaintiffs' emotional distress, rendering Torry's opinions regarding emotional distress "irrelevant." Torry Mem. at 6. But the Court will not decide, at this point, whether Plaintiffs have provided sufficient evidence of a direct impact. In their response brief, Plaintiffs first argue that the direct impact debate is premature, and second, addressing the merits, they argue that they can satisfy Indiana's "direct impact" requirement. *See*

Resp. to Torry Mem. at 15-24. The Court agrees with Plaintiffs as to their first point—that the discussion is premature—and so will not address the merits of the disagreement. Because the question of whether Plaintiffs can satisfy the direct impact component of Indiana's modified impact rule is a question appropriate for resolution at a later stage of the litigation, the Court rejects the RTX Defendant's argument that Torry's testimony as to emotional distress is irrelevant.

The RTX Defendants also allege that Torry's opinions must be excluded because he fails to break down the Plaintiffs' emotional distress by each specific contaminant, instead opining as to the combined effect of all four contaminants at issue. *See* Torry Mem. at 4. Torry opines that "Ms. Millman's exposure to TCE and the other hazardous chemical[s] has caused her psychological consequences that result in emotional harm," Torry Millman Rpt. at 20, and that "Mr. and Mrs. Powell's exposure to TCE and to the other hazardous chemical[s] has caused them psychological consequences that result in emotional harm," *id*. at 17. The RTX Defendants argue that Dr Torry erred in failing to distinguish between injury caused by benzene—which would be attributable to the Williams Defendants—and injury caused by TCE, vinyl chloride, and DCE— which would be attributable to the RTX Defendants. *Id.* ("Such a distinction is important here where, in order to recover from [the RTX Defendants], Plaintiffs bear the burden of proving that [the RTX Defendants'] contamination caused the alleged injuries.").

The Court agrees with the Plaintiffs that Dr. Torry's failure to distinguish between the emotional distress each Plaintiff experienced as a result of exposure to each chemical is not a reason to exclude his opinions. *See* Resp. to Torry Mem. at 30-32. The RTX Defendants provide no persuasive case law on the point. They cite one case, a Tenth Circuit opinion, in support of this argument, citing it for the proposition that "the experts must prove, 'using techniques subject to objective, independent validation,' that the chemicals at issue were present at 'actual level[s] of

exposure[s]' that are known to cause the kind of harm claimed." Torry Mem. at 4 (citing *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)). This case is not helpful to the RTX Defendants' case. It discusses only what a plaintiff must prove, not what an expert on emotional distress must present.

### b. Reliance on Dr. Wells's Opinions

The RTX Defendants' second argument is that Dr. Torry's opinions must be excluded because Dr. Torry's opinions rely on the opinions of Dr. Wells. *See* Torry Mem. at 7. But as the Court explained in its opinion on the Causation Experts, *see supra* Section III.C.2.a, the Court considered the RTX Defendants' criticism of Dr. Wells when it addressed their memorandum seeking the exclusion of his testimony. Because the Court declined to exclude Dr. Wells's opinions, the Court will not exclude Dr. Torry's opinions for their reliance on those opinions.

### 2. Dr. Torry's Opinions on the "Reasonableness" of Plaintiffs' Distress

The RTX Defendants make additional arguments for the exclusion of Dr. Torry's opinions regarding the "reasonableness" of Plaintiffs' emotional distress.

In his reports, Dr. Torry concludes that the emotional distress experienced by Plaintiffs was "reasonable." *See* Torry Millman Rpt. at 20; Torry Powell Rpt. at 17. The RTX Defendants object to this conclusion, arguing that whether Plaintiffs' emotional distress was "reasonable" is a legal conclusion, and therefore must be determined by the jury and is not appropriate expert testimony. Torry Mem. at 8-9.

As the Seventh Circuit has explained, "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Plaintiffs argue, however, that Dr. Torry may offer these opinions, citing two cases in which an expert was permitted to provide opinions on the

56

"reasonableness" of a party's conduct. Resp. to Torry Mem. at 32-33 (citing *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760-61 (7th Cir. 2010); *Dowe v. Nat'l R.R. Passenger Corp.*, 2004 WL 887410, at *1 (N.D. Ill. Apr. 26, 2024). But as the RTX Defendants point out, these cases are distinguishable, addressing testimony as to reasonableness in a commercial or professional judgment capacity, and not the reasonableness of a person's emotional distress. *See* Reply in Support of Torry Mem. at 6-7.

In *Metavante*, an expert was permitted to testify about commercial reasonableness. 619 F.3d at 760-71. And in *Dowe*, an expert was permitted to testify as to the reasonableness of the conduct of an engineer, as compared to professional standards. 2004 WL 887410, at *1. The testimony admitted in *Metavante* and *Dowe* is distinguishable from the testimony offered here. The experts in those cases testified as to professional standards and departures from professional standards—testimony that is not excluded under *Good Shepherd. See Jimenez v. City of Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013). In fact, in allowing the expert's testimony, the *Dowe* court clarified that while "[a]n expert cannot testify about legal issues on which the court will instruct the jury" but rather "may… identify the standard of care upon which their opinions are based." 2004 WL 887410, at *1. Here, Dr. Torry is not offering testimony regarding professional standards or commercial reasonableness, but is instead offering up a legal conclusion that must be left for the jury to determine. *See S.E.C. v. ITT Educ. Servs.,* 311 F. Supp. 3d 977, 987-88 (S.D. Ind. 2018) (excluding expert opinions regarding whether a party acted reasonably as "legal conclusions that invade the province of the jury").

The Court excludes Dr. Torry's opinions as to the reasonableness of Plaintiffs' emotional distress.

### 3. Causation Opinion Testimony

The RTX Defendants also attack Dr. Torry's causation testimony, arguing that his methodology is not based on scientific principles. *See* Torry Mem. at 10-15.

#### a. Testing Procedures

The RTX Defendants first argue that Dr. Torry employed an improper testing methodology, offering three specific critiques that they argue should render his opinions inadmissible. *See* Torry Mem. at 11-12. Responding generally to these criticisms, Plaintiffs argue that it is important to note that the psychological testing Dr. Torry administered was only one piece of his overall methodology and that he did not use the testing to diagnose Plaintiffs with any specific psychiatric condition. *See* Resp. to Torry Mem. at 35-36. In his deposition, Dr. Torry explained that the tests were "incorporated" into his opinions. *Id.* (citing Torry Dep. at 66:10-20). He continued: "They're not diagnostic testing. They're certainly not diagnosing anything or measuring anything specific so to speak. So, yeah, they were used in forming my opinions." Torry Dep. at 66:10-20.

More specifically, the RTX Defendants first object to Dr. Torry's administration of certain screening psychological tests to Laury and Eric Powell while he was interviewing them together, even though such tests are usually administered to one person at a time. *Id.* at 11. The RTX Defendants note that Dr. Torry agreed during his deposition that interviewing the Powells together could have affected each of their responses. *Id.* (citing Torry Dep. at 30:13-24). But as Plaintiffs point out in response, the RTX Defendants provide no case law or psychiatric guidelines to indicate that this kind of administration would not be permissible. Resp. to Torry Mem. at 37. The only citation the RTX Defendants make in support of this argument is to their own expert, Dr. Benedek, who asserted that administering testing to both Powells at once was "a most unusual method."

Torry Mem. at 11. Further, Dr. Torry explained his reasoning for administering the test to the Powells while they were together, which is that they were more comfortable that way.

The RTX Defendants may emphasize the rarity of this testing procedure during cross-examination and may clarify to the jury that their own expert deemed it unusual. But the fact that the RTX Defendants have offered nothing but their own expert's testimony that the testing procedure is suspect, combined with the fact that Dr. Torry was not using the test to diagnose the Powell's with any actual psychological disorder, leads the Court to decline to exclude Dr. Torry's opinion on this ground.

Second, the RTX Defendants state that it is unclear from Dr. Torry's report whether Plaintiffs themselves checked the boxes on the psychological screening report, or whether Dr. Torry checked the boxes, either during his interviews with the Plaintiffs or after their conclusion. *Id.* They contend that this is a problem particularly for the Event Scale-Revised test, which is described as a self-report questionnaire and must therefore be completed by the examinee, not the interviewer. *Id.* at 12. In response, Plaintiffs clarify that Dr. Torry had the Plaintiffs fill out some of the questionnaires, and he filled others out on the Plaintiffs' behalf while asking them questions. Resp. to Torry Mem. at 39. Dr. Torry deems this an appropriate methodology; Dr. Benedek does not. The Court is, therefore, not persuaded that this is a valid reason to exclude Dr. Torry's opinion. *See Wipf*, 519 F.3d at 385 ("In the case of dueling experts . . . it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony.").

Third, the RTX Defendants cite one of their own expert's reports as asserting that the screening tests utilized by Dr. Torry are ordinarily used in forensic evaluations, and they are not "recognized as able to detect malingering or mental illness such as depression, anxiety, or cognitive disorders." *Id.* (citing Benedek Powell Rpt. at 47). In Dr. Torry's deposition, he disagreed with the

characterization of the tests he uses as forensic only. *See* Torry Dep. at 102:22-103:10 ("So the answer is I don't think I would make that general statement that they're only used for forensic-related reasons."). Plaintiffs also note that these tests "do attempt to account for malingering." Resp. to Torry Mem. at 40. The Court concludes that these debates are for the parties to present to the fact-finder and to debate through cross-examination, and not for the Court to decide now. *See Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009) (a "classic battle of the experts" calls "upon the factfinder to determine what weight and credibility to give each expert.").

### b.  Accepted Psychiatric Principles

The RTX Defendants object to Dr. Torry's opinion that all three Plaintiffs suffer from "extreme emotional distress" on the grounds that there is no such diagnosis in the Diagnostic and Statistical Manual, DSM-V—when asked about it during his deposition, Dr. Torry stated: "it's not a medical diagnosis. It's more of a term." Torry Mem. at 12-13. Because Dr. Torry offers no recognized psychiatric diagnoses for the Plaintiffs, the RTX Defendants argue, his conclusions "are not based on accepted psychiatric principles and must be excluded." *Id.* at 13. But, as Plaintiffs point out in response, the RTX Defendants fail to provide anything to convince the Court that Dr. Torry is required to present a DSM diagnosis in his report.

The RTX Defendants go even further, arguing that the lack of a DSM-V recognized diagnosis "proves that the Plaintiffs do not suffer any kind of emotional distress or other psychological injury for which they may recover in this action." Torry Mem. at 13. This is a point they may make in summary judgment briefing or at trial.

### c.  Consideration of Alternative Causes of Alleged Emotional Distress

Finally, the RTX Defendants argue that Dr. Torry's opinions must be excluded for failure to consider alternative causes of Plaintiffs' alleged emotional distress. Torry Mem. at 14-15.

Concerningly, as authority for this argument, the RTX Defendants represent to the Court that the "Seventh Circuit has made clear that '[i]n deciding whether an expert employed a reliable method, the district court *should consider* '[w]hether the expert has adequately accounted for obvious alternative explanations.''" Torry Mem. at 14 (citing *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014)) (emphasis added). But that is not, in fact, what the appellate court declared. Instead, in the cited case, the Seventh Circuit stated that "the district court *has discretion to consider* 'whether the expert has adequately accounted for obvious alternative explanations'" but that "the expert need not exclude all alternatives with certainty, however." *Brown*, 765 F.3d at 773 (emphasis added) (citations omitted). "*Should* consider" and "*has discretion to* consider" have vastly different meanings.

Separately, the Court does not find that Dr. Torry's opinions should be excluded for failure to consider alternative causes of Plaintiffs' alleged emotional distress. A similar argument aimed at Dr. Torry's opinion in another case was addressed by a different judge in this district in *Hostetler v. Johnson Control, Inc.*, 2020 WL 6044130 (N.D. Ind. Oct. 13, 2020). In that case, the defendants objected to Dr. Torry's causation opinions because "he failed to consider and rule out other potential causes of each plaintiff's emotional distress." *Id.* at *3. In dismissing this argument and declining to exclude Dr. Torry's opinion, the court explained:

> [T]his is not a situation where a plaintiff suffered a discrete injury and an expert attempts to work backward from the injury to identify what caused it. Rather, Dr. Torry discussed with the plaintiffs what they understood and perceived about their exposures and how that affected them, and he traced how those issues impacted their mental health. And notably, the nature of the distress they described was uniquely tied to the exposures as opposed to other causes.

*Id.* The *Hostetler* court also found that Dr. Torry had "considered and explained why other conditions or stressors were not causing the distress they were experiencing at the time, even if not at the level of granularity that [the defendants] preferr[ed]." *Id.* at 4.

The RTX Defendants are correct that the discussion of the other potential stressors in Dr. Torry's reports is cursory. However, Dr. Torry testified in his deposition that he did consider such stressors in reaching his conclusions. He explains that, regarding Millman, he considered "anything and everything that could have caused [her distress]," including her lack of a prior psychiatric history as well as stressors such as the death of her husband and siblings and the COVID-19 pandemic. Torry Dep. at 92:6-93:25. Regarding the Powells, he testified that he considered "any and all causes that came to light during the course of [his] evaluation and the medical records," including the death of Laury Powell's parents and an attack experienced by Eric Powell.

But most persuasive to the Court is the fact that—as was the case in *Hostetler*—Dr. Torry's report discusses a very specific emotional distress. As the *Hostetler* court explained, this is not a case in which we are presented with an injury and are working backward to look for the cause. Rather, Dr. Torry here traces emotional distress directly from the Plaintiffs' understanding and perception of their exposure. In discussing Millman's emotional distress, Dr. Torry describes, among other things, "a constant and pervasive fear of disease and death for herself and her loved ones," "chronic despair as well as guilt because she was unable to protect her husband," and a difficulty "grapp[ling] with the possibility of a foreshortened future and death of herself and others." Torry Millman Rpt. at 19-20. In discussing the Powells' emotional distress, Dr. Torry describes "[a] constant and pervasive fear of disease and death for [themselves] and [their] loved ones" and feelings of "helpless[ness] and powerless[ness] to combat this increased lifetime risk." Torry Powell Rpt. at 17. These described feelings of emotional distress are so directly related to the contamination and alleged resulting health risks that it would be strange to require Dr. Torry to write explanations as to why he does not believe these feelings are caused by other stressors such

62

as unrelated family deaths and job stress. With that context in mind, along with Dr. Torry's testimony as to his consideration of these other stressors—and the Seventh Circuits direction that the Court has discretion to consider Dr. Torry's accounting for alternative explanations—the Court will not exclude Dr. Torry's causation opinions on this ground.

In their reply brief, the RTX Defendants emphasize that Torry should have specifically mentioned the ongoing litigation as a potential stressor in Plaintiffs' lives. Torry Reply at 8-9. The RTX Defendants can use cross-examination to point out to the jury what they judge to be a lack of sufficient discussion of alternative stressors, including this litigation, and may offer conflicting evidence and opinions as to Plaintiffs' emotional distress and its causation. These are matters of weight for the jury, and not the Court, to resolve. *See Hostetler*, 2020 WL 6044130, at *4; *see also Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy.").

The Court finds that Dr. Torry's opinions satisfy Rule 702's requirements and will not exclude them.

IV.    **Conclusion**

For the reasons set forth above, the Court grants in part and denies in part the Motion to Exclude filed by the RTX Defendants (ECF No. 328). The Court grants the Motion with respect to Dr. Zachary D. Torry's opinions as to the reasonableness of the Plaintiffs' emotional distress damages. The Court denies the motion with respect to Paul Sadin, Dr. James Wells, Dr. Kathleen Gilbert, Dr. Kenneth Spaeth, and the other opinions offered by Dr. Torry.

SO ORDERED on June 16, 2026.

s/ Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT

63